**AVON PRODUCTS, INC., Plaintiff,**

v.

**S.C. JOHNSON & SON, INC., Defendant.**

**No. 94 CIV. 3958(SS).**

United States District Court,
S.D. New York.

Nov. 19, 1997.

Weil, Gotshal & Manges LLP, New York, NY, for Plaintiff–Counterclaim Defendant.

Steven Alan Reiss, David G. Feher, Jennifer Sclar, Charles S. Hellman, Donna Edbril, In-house Counsel, for Avon Products, Inc.

Pattishall, McAuliffe, Newbury Hilliard & Geraldson, Chicago, IL, for Defendant–Counterclaim Plaintiff.

Robert M. Newbury, Joseph N. Welch, Mary E. Innis, Fitzpatrick, Cella, Harper &
Scinto, New York, NY, for Defendant–Counterclaim Plaintiff.

Edward E. Vassallo, Leslie Mitchell, Stanley E. Sutherland, In-house Counsel, for S.C. Johnson & Son, Inc.

### OPINION AND ORDER

SOTOMAYOR, District Judge.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

In *Frigaliment Importing Co. v. B.N.S. Int'l. Sales Corp.*, 190 F.Supp. 116 (S.D.N.Y. 1960), Judge Friendly posed the question "What is chicken?" This case poses the question "What is insect repellent?"

Plaintiff and counterclaim defendant Avon Products, Inc. ("Avon") manufactures Skin–So–Soft bath oil ("SSS"), a beauty product that, for reasons not entirely clear, also has some efficacy as an insect repellent, though it is not registered as such with the Environmental Protection Agency ("E.P.A."). Defendant and counterclaim plaintiff S.C. Johnson & Son, Inc. ("S.C.Johnson") manufactures various E.P.A.–registered chemical based repellents, including OFF!. S.C. Johnson alleges that Avon has marketed SSS as an insect repellent in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1992), and Sections 349 and 350 of the New York General Business Law; and has engaged in unfair competition under the common law.

S.C. Johnson seeks compensatory damages equivalent to the profits of which Avon has allegedly deprived S.C. Johnson because of Avon's marketing of SSS as an insect repellent. S.C. Johnson also seeks various forms of injunctive relief, including an order requiring Avon to place disclaimers on all SSS promotional materials and bottles for a three year period stating that scientific testing has revealed that SSS does not effectively repel insects. S.C. Johnson also seeks orders requiring Avon to adopt policies that sanction employees and sales representatives who promote SSS as a repellent and requiring Avon to respond to all media inquiries regarding repellency with a statement that it has been demonstrated through scientific

testing that Skin–So–Soft bath oil does not effectively repel insects. Finally, S.C. Johnson seeks an award of attorney's fees pursuant to 15 U.S.C. § 1117(a) (1992).

Avon denies that it has marketed SSS as an insect repellent and contends that SSS is sufficiently effective as a repellent such that marketing it as such does not constitute false advertising. Avon also asserts that S.C. Johnson's claims are barred by the equitable doctrines of laches and unclean hands. Finally, Avon seeks an award of attorneys' fees pursuant to 15 U.S.C. § 1117(a).

, For the reasons to be discussed, I find that Avon has, to a limited extent, marketed SSS as an insect repellent, but that SSS is sufficiently effective as an insect repellent that Avon's actions do not violate the Lanham Act or the New York General Business Law, and do not constitute common law unfair competition. I also find that S.C. Johnson's delay in bringing this suit renders the relief it seeks unwarranted as a matter of equity. Accordingly, S.C. Johnson's claims for monetary damages and injunctive relief are denied. Avon's claim for attorneys' fees is denied because I do not find that S.C. Johnson has brought this case in bad faith.

## A. PROCEDURAL HISTORY

Avon initiated this case, originally assigned to Judge Allen G. Schwartz, by seeking to enjoin S.C. Johnson from publishing a print advertisement and a television commercial it claimed violated Section 43(a) of the Lanham Act. By Opinion and Order dated June 10, 1994, Judge Schwartz denied Avon's motion as to the television commercial, but enjoined distribution of the print ad. By Order dated February 7, 1997, the Court dismissed Avon's claim based upon the parties' settlement of the issue.

In response to Avon's motion for a preliminary injunction, S.C. Johnson asserted two counterclaims. The first counterclaim alleged that Avon's marketing of an E.P.A. approved product under the name "Skin–So–Soft Moisturizing Suncare Plus Mosquito, Flea & Deertick Repellent SPF 15 PABA–Free Sunscreen Lotion" ("Skin–So–Soft Three–In–One Product") violated Section 43(a) of the Lanham Act, Sections 349 and 350 of the New York General Business Law and constituted unfair competition under the common law. By Order dated August 22, 1996, Judge Schwartz granted Avon's motion to dismiss Count I of S.C. Johnson's counterclaim, leaving the second counterclaim as the only remaining part of this case.

The second counterclaim, which is the only claim *sub judice*, alleged that Avon had violated the Lanham Act and the New York General Business Law ("GBL"), and had engaged in unfair competition by marketing and selling SSS as an insect repellent.

On January 13, 1997, this case was reassigned to Judge Leonard B. Sand, who by Order dated January 23, 1997, denied Avon's motion for summary judgment on S.C. Johnson's second counterclaim. On January 27, 1997, this case was reassigned to the undersigned.

Trial of S.C. Johnson's second counterclaim commenced on July 14, 1997. The parties presented direct testimony in the form of testimonial declarations submitted to the Court prior to trial. The court heard cross-examination on July 14, 15, 16, 17, 18, 22, 23 and 24, 1997. Summations were presented on August 18, 1997.

## B. STIPULATED FACTS

The parties stipulated to the following facts in their Joint Consolidated Pretrial Order of May 1997, which the Court adopts as findings of fact:

### I. *THE PARTIES*

1. S.C. Johnson & Son, Inc. is a Wisconsin corporation having its principal place of business in Racine, Wisconsin.

2. Avon Products, Inc. is a New York corporation with its principal place of business in New York, New York.

### II. *S.C. JOHNSON'S OFF! REPELLENTS*

3. S.C. Johnson markets a wide variety of chemical specialty products, including products used for insect control.

4. S.C. Johnson's insect control products include the OFF! line of insect repellents which are sold primarily through retail channels of trade.

5. OFF! insect repellent is currently sold by S.C. Johnson in a variety of forms including aerosol, pump spray, lotion, stick, and towelettes.

6. Each year a seasonal increase in sales of S.C. Johnson's OFF! repellents occurs in the late spring and summer months.

7. The active ingredient in S.C. Johnson's OFF! line of insect repellents is N,N-dimethyl-meta-toluamide ("DEET"). Different concentrations of DEET are used in the various OFF! repellents. DEET is proven to be an effective insect repellent.

8. S.C. Johnson's OFF! repellents are registered with the E.P.A.

9. In 1988, S.C. Johnson initiated Project Vulture, which resulted in the development of OFF! Skintastic.

10. In 1991, S.C. Johnson began to market a DEET–based insect repellent in a moisturizing lotion under the mark "OFF! Skintastic." That product is registered with the E.P.A.

### III. S.C. JOHNSON KNOWLEDGE OF THE USE AND SALE OF SKIN–SO–SOFT BATH OIL TO REPEL INSECTS

11. In the mid–1970s, the President of S.C. Johnson asked Arthur Hageman of S.C. Johnson to conduct insect repellency tests of Skin–So–Soft Bath Oil. In the 1970s, Mr. Hageman tested Skin–So–Soft Bath Oil for repellency against black flies and mosquitoes and found no repellency.

### IV. AVON'S SALES STRUCTURE

#### A. Sales Representatives

12. Avon primarily sells its products to the public through sales representatives, not retail stores.

13. The majority of sales representatives are women who sell Avon products in their "spare" time, either to supplement their earnings from a full-time job, or to provide some income while being full-time care providers to their families.

14. At any given time, there are approximately 450,000 to 500,000 active sales representatives selling Avon's products.

#### B. District Managers

15. At any given time, there are between approximately 1,800 and 2,000 District Managers.

16. Avon's District Managers are employees of Avon.

#### C. Division Managers

17. At any given time, there are between approximately 80 and 100 Division Managers.

18. Avon's Division Managers are employees of Avon.

19. Each Division Manager trains, supervises and coordinates the activities of all of the District Managers who are assigned to his or her Division.

20. From time to time, Avon Division Managers may attend the District Manager's monthly sales meetings with representatives for observation purposes.

#### D. Regional Vice Presidents

21. Regional Vice Presidents are responsible for supervising and coordinating the District Managers within each of Avon's four "operating business units" or "OBUs." There are four Regional Vice Presidents, one for each of the following regions: North; Northeast; Southeast; and West.

### V. SKIN–SO–SOFT BATH OIL

22. Since approximately the early 1960s, Avon has sold a bath oil under the name Skin–So–Soft bath oil.

23. Avon has been aware at least since 1978 that many consumers use Skin–So–Soft bath oil to repel insects.

24. Skin–So–Soft bath oil has never been registered with the E.P.A. as an insect repellent.

25. Avon considered registering Skin–So–Soft bath oil as an insect repellent with the E.P.A., but decided not to do so.

26. Avon tested Skin–So–Soft bath oil for insect repellency as early as 1987.

## VI. THE "SECRET" AND "EIGHTH WONDER" ADS

27. In 1988, Avon advertised Skin–So–Soft bath oil in a print advertisement which stated:

"Millions of people know the secret of Skin–So–Soft. Do you? It used to be America's best kept secret. Now, more and more people simply won't face the summer without Avon Skin So Soft. Here's a perfect way to discover the soothing benefits of America's number one selling bath oil. Try it now and see for yourself what millions already know. Avon."

28. In 1988, the "Secret" ad was published in *USA Today*.

29. In 1989, Avon advertised Skin–So–Soft bath oil as the "EIGHTH WONDER OF THE WORLD" in a print ad.

## VII. AVON'S CONSUMER INFORMATION CENTER

30. Avon operates a Consumer Information Center ("CIC") a function of which is to respond to questions from consumers and to provide management with information about questions or issues that arise regarding Avon products. Avon's CIC can be reached via a 1–800 toll free direct number throughout the year.

31. Avon's CIC has received questions from consumers regarding use of Skin–So–Soft bath oil as an insect repellent for at least 13 years.

## VIII. LISTS OF ALTERNATIVE USES

32. Certain sales representatives have disseminated lists of alternative uses for Skin–So–Soft bath oil, which include its use to repel insects.

33. Avon's CIC has, on occasion, received inquiries from consumers and sales representatives about obtaining copies of "lists" of many uses.

34. Avon had copies of "lists of uses" in their company marketing files.

## IX. "AVON CALLING" AND OTHER AVON PROMOTIONS

35. In 1954, Avon began a national advertising campaign, including television advertising, which featured the slogan "DING DONG . . . AVON CALLING."

36. In 1971, Avon registered the slogan "AVON CALLING" as a trademark in the United States Patent and Trademark Office in International Class 35 for Advertising and Business Services, Reg. No. 927,039. In 1991, Avon renewed its "AVON CALLING" trademark for a period of ten years alleging continuous use of "AVON CALLING" since January, 1955.

## X. AVON'S LAUNCH OF SKIN–SO–SOFT THREE–IN–ONE PRODUCT

37. In 1993, Avon's marketing managers developed and adopted a "megabranding" marketing strategy for Avon's Skin–So–Soft business.

38. Avon's "megabranding" strategy was based on a marketing concept of extending the known equities of the brand into line extensions which would enable the brand to achieve further growth.

39. As part of its megabranding strategy, Avon conducted market research to determine the brand equities associated with Skin–So–Soft bath oil.

40. Annette DeVita was involved in developing and implementing Avon's megabranding strategy for Skin–So–Soft.

41. Avon obtained a sublicense to sell an E.P.A. registered insect repellent product developed by another company, Primavera Laboratories, Inc. and in May 1994, Avon began to market that product under the name "Skin–So–Soft Moisturizing Suncare Plus Mosquito, Flea & Deertick Repellent SPF 15 PABA–Free Sunscreen Lotion" ("Skin–So–Soft Three–In–One Product").

42. In May 1994, Avon promoted the Skin–So–Soft Three–In–One Product with a national television campaign entitled "Let Kids Be Kids."

## XI. *DEET*

43. All of S.C. Johnson's personal repellent products contain DEET. DEET is the most commonly used active ingredient in insect repellents.

44. S.C. Johnson has never offered a non–DEET personal repellent to the public.

## XII. *EFFICACY TESTS: APPLICATION AMOUNT*

45. For products applied directly to the skin, a relevant element in both laboratory and field tests may be the amount of test substance applied to a test subject's skin.

46. In the late 1980's, Avon retained Insect Control and Research of Baltimore, Maryland ("ICR") to conduct insect repellency tests of Skin–So–Soft bath oil.

47. In conducting its laboratory and field tests of various personal repellents, S.C. Johnson generally applies approximately 1 gram, or 1.54 mg/cmst repellent to the forearm (wrist to elbow) of each test subject.

48. When Avon conducted a field study of Skin–So–Soft bath oil in December 1995 in the Everglades, approximately 2 mg/cmd to each of the test subjects.

## XIII. *EFFICACY TESTS: FIRST CONFIRMED BITE*

49. The term "first confirmed bite," in reference to mosquito repellents, refers to a bite followed by another bite within a thirty minute period. The first bite is the confirmed bite; the second bite is the confirming bite.

## XIV. *EFFICACY TESTS: MOSQUITO DENSITIES*

50. In order to obtain reliable results, mosquito repellency field tests must be conducted where there is sufficient mosquito density.

---

51. Variables such as weather conditions, mosquito biting habits, and differences in attractiveness of people to mosquitoes play a role in whether or not a person is bitten by a mosquito at any given point in time.

### OFF! SKINTASTIC FOR CHILDREN

52. In 1993, S.C. Johnson test-marketed a product labelled as "OFF! Skintastic for Children" in the Northeast United States.

53. S.C. Johnson discontinued OFF! Skintastic for Children at the end of 1994. In 1995, S.C. Johnson introduced "OFF! Skintastic for Kids" a spray product with 5% DEET, a lower percentage than the 7.5% DEET in OFF! Skintastic.

## C. ADDITIONAL FACTUAL FINDINGS

Based on the testimony presented and the exhibits admitted at trial, I make the following additional factual findings pursuant to Fed.R.Civ.P. 52.

## XV. *THE REPELLENCY FOLKLORE*

54. SSS was the best selling insect repellent in 1992, 1993, and 1994. (Causey Decl [1]. ¶¶ 4–6.) [2]

55. The average user of SSS as an insect repellent uses the product as a repellent for an average of 6.5 years. (TX [3] 203 at 176.)

56. Consumers perceive SSS to be an effective repellent and use it as such.

57. Consumer surveys conducted by S.C. Johnson indicate that consumers believe that SSS lasts approximately as long as chemical based repellents, somewhere between three and four hours. (Wind Decl. ¶ 39; TX 165, 166 at 2–4, 199 at 1058, 200 at 003326.) SSS is sold on store shelves next to insect repellents (TX 19).

## XVI. *AVON'S AMBIGUOUS RESPONSE TO THE REPELLENCY FOLKLORE*

### A. Avon's Official Policy Regarding SSS

58. The marketing of SSS as an insect repellent is contrary to Avon's official policy.

---

1. "Decl." refers to the testimonial declarations and expert reports submitted by the parties at trial.

2. The record submitted at trial is voluminous. The Court herein references only a representative sample of the evidence supporting the Court's conclusion.

3. "TX" refers to the trial exhibits submitted jointly by the parties.

a. Since the 1980's, it has been Avon's official policy to respond to consumer inquiries about the repellency power of SSS with a statement to the effect that "Avon markets this product solely as a moisturizing bath product and there is no ingredient or combination of ingredients in Skin–So–Soft that could be considered an insect repellent." (*See e.g.* TT[4] at 962, 993–996; Baron Decl. *passim;* TX 420 at 0001898, 0001901, 0001906.)

b. "1–800" Teletech operators who were hired to take customer orders for Avon were provided with a "help screen" in the early 1990's instructing them to inform callers that "there is no ingredient or combination of ingredients in Skin–So–Soft that could be considered an insect repellent. Skin–So–Soft is a bath oil and all the ingredients in the product are approved cosmetic ingredients." (TT 992–993; TX 418.)

c. Avon has consistently responded to inquiries from sales representatives about the marketing of SSS by informing them that SSS should not be marketed as an insect repellent. (*See e.g.* TX 382, 384, 385, 386.)

d. For at least the last fifteen years, all Avon representatives have received a guide to working for Avon entitled "Managing Your Avon Business." The manual states that "[o]nly approved performance or ingredient claims ... are allowed in promoting and advertising Avon products." In the next sentence, the manual states "For example: 'Avon Skin–So–Soft is the world's # 1 bath oil.' (Any other claim is unofficial and not approved.)" (TX 9 at 0113935; TT 922, 941–942, 951.)

e. At least some Avon employees have received warnings from Avon that SSS is not to be marketed as an insect repellent (Merritts Decl. ¶ 10; Rodriguez Decl. ¶ 9) and at least some Avon managers have given Avon sales representatives explicit instructions not to market SSS as an insect repellent (Penninger Decl. ¶¶ 14–15; Rodriguez Decl. ¶ 9).

f. Maria Penninger, currently Vice President of Avon's Southeast Operating Business Unit and an employee of Avon for over thirteen years, also testified that she has received numerous communications, both written and oral, from Avon senior management that SSS should only be promoted as a bath oil and not as an insect repellent, and, consequently, orally informed sales representatives and district managers that SSS should only be promoted for its authorized use. (TT 919–920.) Ms. Penninger has taken "a very aggressive stance" in telling district managers and representatives not to promote SSS as an insect repellent. (TT 930.)

g. Barbara Merritts was told by her District Manager not to promote SSS as an insect repellent when she was a sales representative, and was present at sales meetings when other sales representatives received the same instruction. (TT 939–941.)

h. Avon has also informed some retailers that SSS should not be marketed as a repellent. (*See e.g.* TX 391, 394, 397, 401, 407.)

i. Avon has also consistently informed those conducting consumer opinion surveys about insect repellency that Skin–So–Soft is not an insect repellent. (*See e.g.* TX 387, 395, 396, 400.)

## B. Avon's Promotion of the Repellency Folklore

59. Although the promotion of SSS as an insect repellent is contrary to Avon's official policy, Avon has profited from the use of SSS as an insect repellent and some segments of Avon management have sought to exploit SSS' popularity as an insect repellent by encouraging sales representatives to market it as such.

a. Avon management considers insect repellency to be a brand equity of SSS (TX 137, 144, 145; TT 838–839, 1062), monitors registered insect repellents as competition for SSS (TX 68–72), and has sought to gain marketing benefits from the recall of chemical based repellents, such as S.C.Johnson's Deep Woods OFF! (TX 68–72).

b. At least some members of Avon management have endorsed the idea of reinforcing "SSS's positive word-of-mouth by communicating that it is more than an ordinary bath oil" and, in 1989, Avon's Manager of Advertising, Ron Muckstadt, "instructed two

---

**4.** "TT" refers to the trial transcript in this case.

creative teams to pursue advertising" along these lines. (TX 23; TT 970.)

c. A draft "Divisional Managers Speech" which was apparently prepared for an Avon sales meeting refers to SSS as "the ultimate bathing and bug experience." (TX 53.)

d. I find that this draft speech, in combination with other evidence of management identification of SSS as an insect repellent, is indicative of a culture within Avon that has sought to exploit the popularity of SSS as an insect repellent. This conclusion is reinforced by the fact that Avon's Public Relations Department has never initiated public relations to dispel the notion that SSS is an effective repellent. (TT 963.)

## C. The Lists of Uses

60. Avon sales representatives have used a number of promotional materials to promote SSS as a repellent. These include buttons, flyers, tee-shirts and business cards bearing the words "Avon" or "Skin–So–Soft" and depicting a dead insect inside a circle with a red line through it. (TX 14, 16, 17.)

61. However, the primary promotional material used by Avon's sales representatives to market SSS as a repellent are lists of uses for SSS that identify insect repellency as one such use. (TX 18.)

a. Many of the lists appear to be homemade insofar as they are handwritten or unprofessionally typed and contain spelling errors. (See e.g. TX 18 at 0001777, 0001778–0001779, 0000220–0000221, 0117590, 0117592.)

b. Some of the lists also bear disclaimers explaining that the lists are not authorized by Avon. (TX 18 at 0114697.)

62. However, the Court finds that the strong degree of similarity among the lists, and the variety of locations in which they have appeared, suggest that they are not simply the spontaneous and independent creations of Avon sales representatives.

a. Indeed, Avon has admitted that certain Avon employees, including two District Managers, Jan Schaffer and Brenda Beginski, have, on occasion, provided certain Avon sales representatives with materials in which the use of the Skin–So–Soft Bath Oil as a repellent was described. (TX 231 at 12; TX 237 at 49.)

b. Avon has also admitted that it is aware that some of its sales representatives have violated Avon policy by promoting Skin–So–Soft Bath Oil as an insect repellent. (TX 231 at 14.)

c. By the Court's count, the parties have submitted approximately 110 versions of the lists, though some of these appear to be duplicates. (TX 18.)

d. The lists generally identify approximately 30 uses for SSS including use as a shower moisturizer, a suntan oil, a massage oil and an insect repellent. Insect repellency is almost always use # 8 on the lists. (TX 18.)

e. The majority of lists state that SSS is a "good insect repellent." Some of the lists state that it is an "excellent insect repellent," others state only that is an insect repellent, and still others state only that Avon consumers have used it as an insect repellent. (TX 18.)

f. Some versions of the lists include a reproduction of the "Eighth Wonder of the World" ad. (TX 33–38.)

g. It is not clear how frequently the lists were distributed.

h. Maria Penninger, currently Vice President of Avon's Southeast Operating Business Unit and an employee of Avon for over thirteen years, however, testified that when she was a District Sales Manager in North Carolina in 1983, she saw a list of alternative uses about ten times in one year. (Penninger Decl. ¶¶ 1, 3, 13.) In eight years as a Division Sales Manager for the geographic area covering mid-west Tennessee and a part of Mississippi, she had occasion to see such lists about 50 times. (Penninger Decl. ¶ 13; TT 912.)

63. Evidence before the Court, however, does not support the conclusion that the use of the lists has been widespread.

a. In a survey prepared for this litigation by S.C. Johnson, only 1 of 121 respondents identified a list as the source of their perception that SSS is an effective insect repellent,

suggesting that the lists have not been disseminated very widely. (TT 1217.)

b. Although it is not clear where each list was created or where it was distributed, the lists submitted to the Court indicate creation/or distribution in the following limited locations:

(1) Atlanta, Georgia (TX 18 at 0001775 bears an Atlanta fax legend);

(2) Charlotte, North Carolina (TX 18 at 0001773 invites the customer to contact an Avon representative in Charlotte area code);

(3) New York City (TX 18 at 0001774 and 0001880 bear Manhattan fax legends);

(4) Michigan (TX 18 at 0113639–0113640 is a letter referring to distribution of a list at a Michigan workplace);

(5) Wisconsin and Illinois (TX 18 at 0117662 invites customers to contact Avon District Managers in area code 608, which corresponds to Madison, Wisconsin, 414 which corresponds to Milwaukee, Wisconsin, and 309, which corresponds to Peoria, Illinois);

(6) Anchorage, Alaska, (TX 18 at 118010 invites customers to call an Avon representative in Anchorage, Alaska);

(7) Washington (TX 18 at 118011 invites customers to contact an Avon sales representative in Bremerton, Washington);

(8) Kentucky (TX 18 at AVG 0000199 appears to invite customers to contact an Avon representative in Magnolia, Kentucky);

(9) Virginia (TX 18 at 0001760 and 0001772 bear a Virginia fax legend).

c. Distribution of the lists by sales representatives seems to have been especially prevalent in Wisconsin. In addition to TX 18 at 0117662, a copy of a list which invites consumers to contact Avon District Managers in Milwaukee and Madison, there is substantial deposition testimony regarding distribution of the lists in Wisconsin.

(i) Karen Balian, a former Avon District Manager in Southern California from 1983 to 1987 and a District Manager in Wisconsin from 1987 to 1991, testified that she was encouraged by her Division Managers in Wisconsin to instruct Avon representatives to use the lists as a sales tool and that she gave the lists to representatives as a selling tool at sales meetings. (Balian Dep.[5] at 26, 33, 38.) Balian also testified that she saw the lists circulated within Avon between one and ten times. (Balian Dep. at 57–58.)

(ii) Mary Murphy, a former Avon Sales Representative in Wisconsin in 1990 and 1991, was told by her District Manager to market SSS as an insect repellent and received lists of uses for SSS directly from Avon. (Murphy Dep. at 9–11, 16.) Murphy then distributed the lists of uses to her customers and marketed SSS as an insect repellent to her customers. (Murphy Dep. at 10, 21.) Murphy was never told by her District Manager or anyone from Avon not to market SSS as an insect repellent. (Murphy Dep. at 11.)

(iii) Constance Van Woelderen, a former Avon sales representative in Wisconsin from 1985 to 1992, heard her District Managers say at sales meetings that the bath oil "was excellent for insect repellent." (Van Woelderen Dep. at 8–9, 18–19.) She also testified that she saw lists of uses given out on several occasions. (Van Woelderen Dep. at 19.) Van Woelderen was also instructed by her District Managers at sales meetings to market SSS as an insect repellent, was given the lists at sales meetings to use for this purpose, and used the lists to sell SSS as an insect repellent to her customers. (Van Woelderen Dep. at 19–22, 27.) Van Woelderen was never instructed by anyone from Avon not to market SSS as an insect repellent. (Van Woelderen Dep. at 27–28.)

(iv) Brenda Fry, a former Avon Sales Representative in Wisconsin in 1994 and 1995, was never told by her District Manager or anyone else from Avon not to market SSS as an insect repellent. (Fry Dep. at 17.) [6]

---

5. "Dep." is a reference to the depositions submitted by the parties at trial.

6. S.C. Johnson paid Balian, Van Woelderen, and Murphy $50.00 each to provide testimony in this case. (Balian Dep. at 49; Van Woelderen Dep. at 35; Murphy Dep. at 45.)

64. Distribution of the lists appears to have been less widespread in Avon's Southeast Operating Business Unit ("OBU").

a. There is no testimony regarding the distribution of lists by District Managers outside of Wisconsin, and, in fact, Balian testified that she did not see the list of alternative uses at any point during her five year tenure in California. (Balian Dep. at 33–34.)

b. Barbara Merritts, currently a District Sales Manager in Florida, testified that she has never circulated a list of SSS uses or encouraged or given others permission to circulate that list. She has also never known any of the other District Sales Managers that she works with to circulate the lists of alternative uses of SSS. (Merritts Decl. ¶ 11.) When customers inquire about the use of SSS as an insect repellent, Merritts always responds by telling them that SSS is sold as a bath oil only. (Merritts Decl. ¶ 9.)

c. Maria Penninger, presently Vice President of Avon's Southeast OBU, testified that her OBU has never sent out a list of uses and she has never heard of any Avon OBU sending out such lists with Avon's brochures. (Penninger Decl. ¶ 11.) Whenever Penninger has seen such a list during her thirteen year career with Avon, she has instructed the sales representative in possession of the list not to circulate it. She has also instructed trainees not to promote the product as a repellent. (Penninger Decl. ¶¶ 14–15.)

d. Similarly, Marie Rodriguez testified that ever since becoming a District Sales Manager in 1972 she has received repeated and explicit instructions from Avon that SSS is not to be sold for any alternative uses. (Rodriguez Decl. ¶ 9.) Rodriguez has seen such lists on approximately three occasions during her 25 year career with Avon, and, on each occasion, has instructed the sales representative who brought the list to her attention that the list was prohibited. (Rodriguez Decl. ¶ 10.)

e. There is no evidence before the Court regarding distribution of the lists in other geographic regions.

65. Although the lists appear to have been in circulation since the 1970's, the lists appear to have been distributed primarily during the period 1987 to 1993.

a. One list submitted to the Court is dated July 1987. (TX 18 at 0001878.) Another list, which appears to have been reproduced at least three times, is dated September 1988. (TX 18 at 0117633 and TX 18 at 0117637, TX 18 at 0117647.) Another list appears to have been distributed in August 1991 (TX 18 at 0113639–0113641), while another list is dated May 1992. (TX 18 at 0117662).

b. Three of the lists bear fax legends from 1992 (TX 18 at 0001775, TX 18 at 0001879, TX 18 at 118010) and seven bear fax legends from 1993 (TX 18 at 0000233, TX 18 at 0001760, TX 18 at 0001763, TX 18 at 0001771, TX 18 at 0001772, TX 18 at 0001880, TX 18 at 0001774).

c. Barbara Merritts, currently an Avon District Sales Manager and formerly an Avon sales representative, testified that she first saw a list "in the late seventies." (TT 943.)

d. Maria Penninger, an employee of Avon for over thirteen years, testified that she first saw a list at a sales meeting in 1983. (TT 911.)

e. John Tunnacliffe, an Avon employee since 1980 and Director of National Sales Incentives since 1994 (Tunnacliffe Dep. at 4), testified that he saw an Avon District Manager provide a list of uses of SSS to a new sales representative in 1987 (Tunnacliffe Dep. at 99–101).

66. Distribution of the lists appears to have ceased in approximately 1993, as the Court has been unable to identify any lists that bear a date later than 1993. Moreover, Maria Penninger, Vice–President of Avon's Southeast Operating Business Unit, testified that she has not seen any lists in the past three or four years. (TT 917.) Barbara Merritts, currently an Avon District Sales Manager and formerly an Avon sales representative, testified that she has not seen a list in the past five or six years (TT 944) and Maria Rodriguez, currently a Regional Sales Director in the Southeast (Rodriguez Decl. ¶ 1), has not seen any lists in approximately five years (TT 952).

### D. Newspaper Ads

67. SSS has also been advertised as an insect repellent in certain newspaper advertisements. However, on the limited evidence available, the Court is unable to determine Avon's responsibility for these ads.

a. A newspaper ad which states that Skin–So–Soft is an especially effective insect repellent appears to have run in the area of Monroe, New York. (TX 28.) The ad also invites readers to contact Avon at 1–800–882–1597, for more information. However, Gail Blanke, who until recently was Senior Vice President, Public Affairs, and President of Life Designs at Avon, testified that the 800 number which appears on the ad is probably not an Avon number. (TT 1039.)

b. Another newspaper ad (TX 18 at 0002147) for a store in Edison, New Jersey, claims that "Avon Skin–So–Soft Repels Annoying Insects." There is nothing on the face of this ad to indicate that it was placed by anyone directly connected with Avon management.

c. Another newspaper ad which states "Local Country Meadows Lady Offers Summertime Hints To Make Your Summer More Enjoyable" touts SSS as an "excellent insect repellent" and invites readers to contact an Avon representative named Michelle Parrish. There is nothing in this ad to indicate the date on which it appeared or the location in which it ran. (TX 18 at 0117587.)

68. Having reviewed the promotional materials submitted by S.C. Johnson, I find that some Avon sales representatives have marketed SSS as an insect repellent and have been encouraged to do so by some members of Avon management.

### XVII. *AVON'S CORRECTIVE MEASURES*

69. Avon has taken some measures to enforce its official policy against the marketing of SSS as an insect repellent. However, these measures have been short-term responses to E.P.A. inquiries, rather than sustained efforts to ensure that the policy is followed. Avon has also failed to penalize or discipline representatives for the unauthorized promotion of SSS as an insect repellent. (TT 943–44, 926.)

a. Although Avon has been aware of the repellency folklore since 1975 (TX 89), there is no evidence that Avon warned its sales representatives not to market SSS as a repellent before it received a letter from the E.P.A. in September 1987 stating that certain literature and advertising for SSS was in violation of federal law (TX 127).

b. In 1987, in response to the E.P.A. warning, Avon immediately sent out a "Friday Letter," a weekly communication to district managers, regional managers and national sales managers, instructing them not to promote SSS as an insect repellent. (TT 779; TX 423.) Avon also instructed its Consumer Information Center to advise consumers who called in to ask about SSS' repellency that they should not use SSS as a repellent. (TT 785–786.)

c. In response to the E.P.A. warning, Avon also sent out a first-class mailing to all of its 450,000 sales representatives "asking them not to promote or discuss the product in any way as an insect repellent." (TT 779, 783–784.)

d. Avon did follow-up communications to its sales representatives in the first and second quarters of 1988. (TT 780, TX 426.) In September 1989, in response to a visit from an E.P.A. inspector, Avon distributed a short flyer to District Sales Managers asking them not to promote SSS as anything other than a bath oil. (TX 428.)

e. In March 1990, Avon again reminded District Managers and Sales Representatives that SSS should not be marketed as an insect repellent. (TX 431.)

f. On August 1, 1992, Avon sent out another Friday Letter asking District Managers to "[p]lease remind your Representatives that they should not be promoting Skin–So–Soft as anything but a bath oil." (TX 68 at 0001405.)

g. By letter dated January 21, 1993, the E.P.A. warned Avon that the continued promotion of SSS as an insect repellent could constitute a violation of federal law. (TX 134.) In response, Avon assembled a task force to respond to the E.P.A.'s concerns.

(DeVita Decl. ¶¶ 23–24; Hall Decl. ¶ 11.) The task force assembled several communications that were distributed throughout the sales organization. Among these communications was a letter dated October 22, 1993 (nine months after the date of the E.P.A. warning letter) from Avon's President, Walker Lewis, to all District Sales Managers and Representatives, reminding the sales force of Avon's policy against promotion of SSS as a repellent. (DeVita Decl. ¶ 25; TX 135, 434.)

h. When Avon launched the Skin–So–Soft 3–in–1 product in 1994, it again sent a letter to all representatives reiterating that SSS bath oil is not to be sold as an insect repellent. (TT 1046.)

70. These intermittent communications with managers and sales people were the only steps Avon took during the period 1988–1993 to ensure that its sales representatives would not market SSS as an insect repellent (TT 1049), even though the annual turnover rate of Avon sales representatives is in excess of 100% (Jung Decl. ¶ 7; TT 751), and Avon could reach only 50%–60% of its sales representatives with a mailing (TT 780).

71. Avon has taken no other steps to follow up on the Lewis letter or to insure that its many new representatives were made aware of the warnings set forth in the letter. (TT 860–861.)

72. Avon has an annual turnover rate of over 100%. (Jung Decl. ¶ 7; TT 751.)

73. However, because of the lack of evidence of distribution of the lists since 1993 (*see* ¶ 66 above) the Court concludes that the Lewis letter and Avon's other actions, including the introduction of the 3–in–1 product have been effective in curtailing the unauthorized distribution of the lists.

74. On the basis of this evidence, I find that Avon's response to the widespread consumer perception that SSS is an effective insect repellent has been a mixed one. Although Avon's general corporate policy is to discourage the promotion of SSS as an insect repellent, Avon has clearly sought to reap the benefits of the repellency folklore. This is demonstrated by the evidence that (1) Avon has monitored traditional repellents as competition for SSS; (2) Avon has pursued a "megabranding" strategy designed to leverage the popularity of SSS as a repellent into line extensions like the 3–in–1 product; (3) some members of Avon management have sought to pursue advertising strategies based on SSS' popularity as a repellent and have encouraged sales representatives to market SSS as a repellent; and (4) Avon's corrective measures have been short-term responses to E.P.A. warnings rather than the kind of sustained efforts necessary to ensure compliance given the 100% annual turnover in Avon's sales force.

## XVIII. INDEPENDENT SOURCES OF THE REPELLENCY FOLK-LORE

75. Although Avon has to some extent promoted SSS as an insect repellent, I find that Avon is not the primary source of consumers' perception that SSS is an effective insect repellent. Indeed, several non–Avon sources, including independent media sources, "word-of-mouth," and S.C. Johnson's comparative advertisements have contributed more to the repellency folklore than Avon has.

### A. S.C. Johnson's Attitude and Usage Studies

76. S.C. Johnson's own studies indicate that Avon is not primarily responsible for most consumers' perception that SSS is an effective insect repellent.

77. S.C. Johnson periodically conducts market research on the insect repellent market. It does this primarily through Insect Repellency Category Attitude and Usage Studies ("A & U"). Each A & U surveys consumers in an attempt to determine, *inter alia*, why consumers use the repellents they use. (Boomsma Decl. ¶ 6.) Numerous A & U's conducted during the period 1988–1993 to determine Avon's role in consumers' perception that SSS is an effective repellent yielded widely divergent results and do not offer a precise conclusion as to the exact number of consumers who have been influenced to use SSS as a repellent by an Avon representative. However, taken as a whole, the A & U's do indicate conclusively that only a minority of consumers who use SSS as an

insect repellent first learned of its repellency qualities from an Avon representative.

a. Specifically, A & U's in the following years found the following percentage of those who use SSS as an insect repellent first learned of SSS' repellency qualities from an Avon sales representative:

| Year of SCJ A&U | Percentage influenced by Avon sales representative | |
|---|---|---|
| 1988 | 26% | (TX 198 at 015745) |
| 1991 | 16% | (TX 199 at 001054) |
| 1992 | 14% | (TX 200 at 003313) |
| 1993 | 7% | (TX 201 at Table 62) |
| 1995 | 32% | (TX 203 at 031098) |

b. The 26% and 32% figures in the 1988 and 1995 A & U's appear to be artificially inflated. In the 1988 A & U, 14% of survey respondents had an Avon representative living in their house, a fact which substantially increases the likelihood of their learning about SSS' repellency from an Avon representative (TX 198 at 015747.) The 32% figure in the 1995 A & U is clearly anomalously high in comparison to the other studies. I accept the argument of Avon's expert that the figure was influenced by the "primacy effect," *i.e.* the fact that, in contrast to previous A & U's, "Avon Representative" always appeared as the first answer choice on survey forms asking consumers how they first found out about SSS bath oil as an insect repellent. (TT 241; TT 573; TT at 1211–1214.)

78. Thus, although they do not yield a precise conclusion, S.C. Johnson's A & U's indicate that, at the very most, no more than one-third of consumers, and likely far fewer, have been influenced to purchase SSS for use as a repellent by Avon's marketing and promotion. Moreover, the Wind study submitted by S.C. Johnson, a more scientifically valid study than the A & U's, shows the influence of Avon marketing, to be less than 10%.

### B. Dr. Wind's Study

79. An S.C. Johnson expert, Dr. Yoram Wind, reported in his study that only approx-

imately 18%[7] of consumers who perceive SSS to be an effective insect repellent claim to hold this belief because of Avon's marketing activities, while approximately 49% claim to have learned about SSS' repellency qualities from a friend or from some independent source. (TX 166, Ex. 6, at 4, 27.)

80. However, I find that the percentage of consumers influenced by Avon is likely much lower than Dr. Wind's estimate.

a. For example, Dr. Wind limited his survey to consumers familiar with the use of SSS as a repellent, a limitation which inflates the percent of consumers who might have been influenced by an Avon-related source. (Craig Decl. at 7, ¶ 3.) There are, as admitted by Dr. Wind, and proven by S.C. Johnson's A & U's, substantial numbers of SSS consumers who do not use the product as an insect repellent.

b. Furthermore, an examination of the "Avon related sources" that respondents identified as the source of their perception that *SSS is* an insect repellent also indicates that Dr. Wind's estimate is artificially inflated.

(i) Of the 14 consumers in the survey identified as having been influenced by an Avon related source, seven identified sources that are not clearly related to Avon. Specifically, three survey respondents (3019, 6507, 4514) identified "SSS packaging" or "the Avon catalogue," and one survey respondent (6009) identified "in-store Avon ads" (Craig Decl. at 10) even though neither the SSS packaging nor the Avon catalogue identifies *SSS as* an insect repellent, and Avon has never prepared in-store ads promoting SSS as an insect repellent. (Craig Decl. at 10; Craig Ex. 2; TT 575–583).

(ii) Moreover, three respondents (4502, 6008, 6519) claim to have learned about SSS' repellency qualities from an unspecified "mass media source" that is nowhere identified in the report as having been produced by

---

7. Exhibit 6 to Dr. Wind's study (TX 166) indicates that 14% of consumers were influenced by Avon related sources. However, in ¶ 11 of his rebuttal declaration, Dr. Wind states "The results of my study showed 14 *consumers* attributing directly to Avon the belief that SSS bath oil is an

insect repellent" (emphasis supplied). Thus, it is not clear if Dr. Wind concluded that 14% of consumers were influenced by Avon sources, or that 14 of the 78 consumers he surveyed, and thus 18% of consumers, were influenced by Avon.

Avon. (Craig Decl. at 10.) Because of the widespread dissemination of information about SSS' repellent qualities by independent media sources (see ¶¶ 85–87 *infra* ), I find it more likely that the mass media sources identified by these respondents are not Avon-related.

(iii) Only four survey respondents identified an Avon sales representative as the source of their perception that SSS is an effective repellent and only one identified a list of uses of SSS as the source of that perception.

81. Thus, the percentage of consumers influenced by Avon to believe that SSS is an effective repellent is likely much lower than the 18% identified by Dr. Wind, and is probably closer to 9%. This represents the number of respondents who identified clearly Avon related sources as the source of their perception of SSS' repellent efficacy divided by the number of respondents in Dr. Wind's survey who indicated that they perceived SSS to be a mosquito repellent. (*See also* Craig Decl. at 11.)

82. Integrating Dr. Wind's study in conjunction with S.C. Johnson's A & U's, I find that Avon is responsible for approximately 10%–15% of those consumers who believe that SSS is an effective insect repellent.

## C. Word–of–Mouth

83. "Word-of-mouth" appears to be a more important source of the repellency folklore than Avon's advertising and promotion.

a. For example, John Connell, currently a Senior Market Manager at S.C. Johnson, and an employee of S.C. Johnson for over twenty years with experience in the marketing of insect repellents, testified that the "key reason" for the success of SSS as an insect repellent was "its mystic urban legend quality. It was word of mouth between people who were often family members, friends or people perceived as being down-home honest." (Connell Dep. at 256.)

b. Similarly, Constance Van Woelderen, a former Avon sales representative, whose testimony S.C. Johnson relies upon, testified in deposition that although she and other sales representatives marketed SSS as an insect repellent, "most of it was word-of-mouth.

People already knew the product and wanted to order more of it. I mean, they used it in the past or heard from others that had it. . . ." (Van Woelderen Dep. at 27.)

c. The testimony of Connell and Van Woelderen is also supported by S.C. Johnson's consumer survey data.

(i) Indeed, Dr. Wind's study found that approximately 45% of consumers who believe SSS to be an effective repellent claim to have learned about SSS' repellency qualities from a friend or from some independent source, approximately three times the number who claim to have learned about it from an Avon related source. (TX 166, Ex. 6.)

(ii) Similarly, S.C. Johnson's 1992 A & U found that 46% of consumers purchased SSS because of a recommendation from a friend and that "recommendation from a friend" was the leading factor influencing consumers' purchases of the product. (TX 200 at 003313.) The 1990 and 1992 A & U's also revealed that consumers consider friends to be a much more reliable source of information about insect repellents than sales representatives, who were identified as the *least* reliable source of such information. (TX 199 at 001055; TX 200 at 003331; TT at 1219.)

84. Accordingly, I find that word-of-mouth has been the primary instrument for the dissemination of the SSS repellency folklore.

## D. Independent Media Sources

85. Independent articles in the media, however, have also contributed greatly to the perception that SSS is an effective insect repellent.

86. The Court has reviewed more than 300 media items in which SSS has been identified as an effective repellent. (TX 381.)

a. These media reports include an interview given by then President Jimmy Carter, in 1979, endorsing the use of SSS as a bug repellent (TX 381 at 3), and a television interview given by Mr. Carter in 1988, also touting the efficacy of SSS as an insect repellent (TX 618).

b. A representative sample of the 300 media items depicting SSS as a repellent includes, *inter alia,*

   (i) a June 16, 1988 article in the New York Times touting SSS' efficacy as an insect repellent (TX 381 at 25);

   (ii) a July 1991 article in McCall's stating that many people "swear by" SSS and that its efficacy as a repellent has been documented in medical journals (TX 381 at 92);

   (iii) an August 16, 1992 article in the New York Times about problems with chemical based repellents, stating that SSS "by word of mouth has gained a reputation among campers and anglers as an excellent insect repellent" (TX 381 at 152);

   (iv) a 1993 article in the Atlanta Journal and Constitution about the use of non–DEET based repellents for children, which identifies SSS as "the nation's most popular bug repellent" (TX 381 at 168 at 0130155); and

   (v) a 1988 segment which aired on CBS This Morning about lyme disease which identified SSS bath oil as an effective insect repellent (TX 620).

87. Having reviewed all of these items, I find that the media has played a more significant role in the dissemination of the perception that SSS is an effective repellent than has Avon's promotion by sales representatives or lists.

### E. S.C. Johnson's Advertisements

88. Ironically, another source of consumers' perception that SSS is an effective insect repellent are S.C. Johnson advertisements. (TT 83–84.)

a. The first time SSS bath oil was ever advertised as a repellent in print or on television was in S.C. Johnson's ads. (TT 182–184.) S.C. Johnson advertisements include nationally-run print advertisements comparing the repellent power of Johnson's Skintastic product (*see* Stipulated Facts 9–10 *supra* ) to SSS bath oil (TX 310 at 2 and TX 487 at 0117484) and a national television advertisement comparing Skintastic to SSS bath oil (TX 621 and TX 622).

b. S.C. Johnson's comparative advertisements are more explicit in identifying the repellency qualities of SSS than the "Eighth Wonder" and "Secret" ads which S.C. Johnson relies upon as evidence of Avon's false advertising campaign and are as responsible for the dissemination of information about SSS' repellency power as anything produced by Avon.

### F. Conclusion

89. Although Avon has clearly played some role in the dissemination of the repellency folklore, it is not the primary source of consumers' perception that SSS is an effective insect repellent. Rather, the main source of this perception appears to be word-of-mouth based upon consumer satisfaction and the efficacy of SSS as an insect repellent.

## XIX. *THE EFFICACY OF SSS AS AN INSECT REPELLENT*

90. Having found that consumers use SSS as an insect repellent and that Avon has to some extent promoted it as such, I now turn to the entomological evidence regarding SSS' efficacy as an insect repellent.

### A. The Methodology of Entomology

91. Entomologists test repellents for efficacy in either laboratory tests, also known as "arm-in-cage" tests, or in field tests. (Hageman Decl. ¶ 5.) Arm-in-cage tests, in which a human arm treated with a repellent substance is inserted into a cage of insects, are useful only to screen out substances without significant repellent quality. If a substance fails an arm-in-cage test, it will not be tested in a field test. (Hageman Decl. ¶ 9; Novak Decl. at 3.) Entomologists also consider arm-in-cage tests to be less reliable than field tests because they eliminate all environmental variables. (Novak at 3; TT at 295, 1156–1157.)

92. Entomologists use the "time to first confirmed bite" as the standard measure of whether a product effectively repels mosquitoes. As noted in Stipulated Fact 49 *supra,* "first confirmed bite" refers to the practice of confirming a first mosquito bite by observation of a *second* mosquito bite within thirty minutes of the first bite. Thus, the term "first confirmed bite" refers to two bites

within thirty minutes of each other. (TT 420.)

93. Entomologists use the term "complete protection time" to refer to the time between the application of the product being tested for repellency and the "first confirmed bite" by a mosquito. (Hageman Decl. ¶ 15.)

94. Insect repellents display a wide variability of performance among different individuals (TT 311) and none of the first confirmed bite protection times are guarantees to the consumer that he or she will be completely protected from a bite for that period. In fact, approximately 50% of consumers will receive a first confirmed bite before the average time. (TT 302–303.) If a product has a mean time to first confirmed bite of 2–3 hours, it is virtually certain with any normal distribution curve that many consumers will get a protection time of less than 2–3 hours. (TT 420–422.)

95. As evidenced by the E.P.A. Pesticide Assessment Guidelines, entomologists consider "landing density" and "biting pressure" to be important factors in evaluating test data offered to prove claims of repellency. (TX 174 at 15373.) [8] In field tests, S.C. Johnson normally requires a minimum of 50 mosquito lands per minute because at lower densities, a mosquito may not be available to bite as soon as the repellent ceases to be effective. (Hageman Decl. ¶ 10; TX 186 at 3.) However, some entomologists consider 50 bites per minute to be unrealistic and appropriate only for military tests. (TT 1085.) In May 1995, the E.P.A. accepted the test protocol for the "Three in One" product (see Stipulated Facts 41–42 supra), which specified a biting pressure of 1–10 bites per minute. By implication, the E.P.A. found that this biting rate met the E.P.A.'s product performance guidelines (TX 356 at 0127213; TX 357; TT 1128–1131.)

96. Mosquito species vary in biting aggressiveness and entomologists consider the species of mosquito against which a repellent is tested to be a factor in evaluating the repellent's efficacy. (TT 1111.) The taenia-rhynchus species is apparently among the most aggressive species. The mosquito species present in a typical backyard situation varies by section of the country. (TT 1116–17.)

97. A key factor to consider in evaluating the efficacy of a repellent is the duration of its repellency effect.

98. Remarkably, the E.P.A. has not set a single, clear duration standard for products sought to be registered as insect repellents. Rather, the E.P.A. has adopted a case-specific approach to registering insect repellents, evaluating each product in terms of the conditions under which it is to be used, the ingredients which it contains, and the claims made on its label.

a. In 1982, the E.P.A., in its Pesticide Assessment Guidelines, stated that in order to be considered an effective repellent a product should "generally" provide a minimum of 2–3 hours protection time "based upon first confirmed bite field tests, depending upon the biting pressure evidenced in the testing." (TX 174 at 15373; TX 358.)

b. However, in May, 1992, the E.P.A. approved registration of Primavera's TREO Product (see Stipulated Fact 41 supra), which demonstrated effectiveness for one hour, on the condition that the product label state "Effectiveness lasts for up to one hour. Reapply when effectiveness diminishes." (TX 353 at 2; TT 427.)

c. In 1997, in an effort to encourage the registration of non-toxic repellents, the E.P.A. officially "relaxed" the 1982 Product Performance Guidelines and approved a one-hour efficacy standard for insect repellents having citronella oil as their active ingredient on the condition that "the user is provided instructions on how to maintain effective protection." (TX 639 at 6.)

99. Although S.C. Johnson's A & U studies show that consumers re-apply most insect repellents every three-four hours (see e.g. TX 200 at 003326), S.C. Johnson has not conducted any survey which indicates what the consumer definition of an "effective" insect repellent is, nor has S.C. Johnson conducted any research to determine how long a repel-

---

8. Although "landings" and "bites" are distinct concepts, entomologists use them interchange-ably in evaluating the repellency power of any particular substance. (TT 1141.)

lent must last in order to be considered a repellent by consumers. (TT 261.) S.C. Johnson has also not done any research indicating that consumers link insect repellent efficacy to E.P.A. registration. (TT 261.)

### B. The Efficacy of SSS Against Mosquitoes

100. A number of tests conducted by the parties and by independent researchers on the efficacy of SSS as an insect repellent yield divergent results and offer no precise conclusion as to the potency or duration of SSS' ability to repel insects.

101. However, taken as a whole, these tests indicate that SSS does have some efficacy as an insect repellent and provides protection against mosquitoes for somewhere between 30 minutes and two hours.

102. The tests also indicate, however, that SSS is not as effective as traditional, chemical-based repellents and that it is less effective at repelling mosquitoes than it is at repelling other insects such as gnats, sand flies and midges.

### Independent Field Tests of SSS against Mosquitoes

103. The parties have presented evidence of two independent field tests of SSS against mosquitoes.

a. The first of these, a 1979 study by the Letterman Army Institute of Research, published in Mosquito News in 1982, concluded that SSS is a "true repellent" of the yellow fever mosquito, aedes aegypti, with an effective half life [9] of 1.6 hours. The same study concluded, however, that, four hours after application, even at maximal dosages, SSS provided less than 50% protection. The study also concluded that aedes aegypti "is about 30 times more sensitive to deer than to Skin–So–Soft bath oil." (TX 326 at 0001794–0001795.)

b. A 1986 follow up to the 1979 Letterman study corrected the statistical half-life calculations of the 1979 study with regard to SSS downward to .51 hours. However, the study concluded that "[t]his reanalysis confirms our original conclusion ... that al-

though the bath oil is effective against Ae. aegypti, it is not as persistent as DEET, which has a half life of .67 hr. It will provide effective protection if applied as frequently as needed." (TX 327 at 422; TT 483.)

c. In a 1991 "percent repellency" test designed to measure the relative efficacy of SSS and five different DEET products against spring aedes mosquitoes over a twelve hour period (TX 182), G. Surgeoner and J. Heal of the Department of Environmental Biology of the University of Guelph, Ontario concluded that SSS provided approximately 58% protection after four hours, but provided no significant protection after eight hours. (TX 182 at 000831, 000832.) The study also revealed that SSS performed significantly worse than all five DEET products at every interval at which the products were tested. (TX 182 at 000834.)

### S.C. Johnson's Field Tests of SSS against Mosquitoes

104. S.C. Johnson has presented evidence of three field tests it conducted to determine the efficacy of SSS against mosquitoes.

a. In June 1989, S.C. Johnson performed a field test of SSS and other substances against the aedes vexans and the aedes stimulans species of mosquitoes in Sanders Park, Wisconsin. (TX 194.) The test was conducted over seven days under conditions which were generally "poor" or "fair." (TX 194 at 013802; TT 397–399.)

(i) In this test, SSS provided protection against a confirmed bite for 84 minutes in densities varying from five to thirty mosquito lands per minute. (TX 336 at 013787; TT 398–400.)

(ii) Under the same conditions, a product containing 10% DEET provided protection against a confirmed bite for 127 minutes. (TX 336 at 013787.)

b. In August 1989, S.C. Johnson performed a field test of SSS on the Gumbo Limbo trail in the Everglades, Florida against the aedes taeniarhynchus species of mosquito. (TX 193.)

9. The term "effective half-life" refers to the time required for a substance to become half as effec-

tive as it was initially. (TX 327 n. 12; TT 483–484.)

(i) In densities of 300–2,000 landings per minute, SSS had a mean time to confirmed bite of approximately 24 minutes. (TX 193 at 013761; TT 334–336.)

(ii) Under the same conditions, DEET based repellents appear to have provided on average approximately three to four hours of protection against a confirmed bite (TX 337) and a 30% DEET product provided over five hours of protection (TT 359).

c. In July 1993, S.C. Johnson performed a field test of SSS over two days in an S.C. Johnson employee's backyard ("Russ' Woods") in Wisconsin. The mosquito species present were *aedes vexans, aedes stimulans* and *aedes trivittatus.* (TX 192 at SCJ 013697.)

(i) On day one, in densities of 104–120 landings per minute, SSS had a mean time to confirmed bite of 37.5 minutes. On day two, in densities of 256 landings per minute, SSS had a mean time to confirmed bite of 20 minutes. (TX 192 at 013697.)

(ii) Under the same conditions, Skintastic Pump with 7% DEET had a mean time to confirmed bite of 96 minutes on day one and a mean time to confirmed bite of 100 minutes on day two. (TX 192 at 013697.)

105. I find that the results of the S.C. Johnson tests are of only limited utility in evaluating the efficacy of SSS as an insect repellent for several reasons.

a. First, none of the tests was conducted according to "Good Laboratory Practices." (TT 345–346.) Good Laboratory Practices ("GLP") refers to a scientific testing methodology, that requires an accurate paper trail, and adherence to standard operating procedures and to an agreed upon protocol. In a GLP test, the procedures to be followed during the test are set forth in a test protocol that is written and agreed-upon by the testing facility management, study director, quality assurance officer and the sponsor. All deviations from the protocol and the standard operating procedures are recorded. (Bertsch Decl. ¶ 9; TT 1004–1005.) During the preparation for and the conduct of a GLP test, an independent Quality Assurance Officer closely monitors the conduct of the study. (Bertsch Decl. ¶ 10.) Since 1992, the E.P.A.

has required that data submitted in support of registration of repellents include GLP data. (TT 353.)

b. Second, no entomologist was present at any of the S.C. Johnson field tests. (TT 397, 404.) The Russ' Woods and Sanders Park tests were conducted by Ray Verwey, a "technologist" in S.C. Johnson's Entomology Research Section, with no formal training in entomology. (Verwey Decl. ¶ 1; TT 370.)

c. Third, the three tests utilized a total of only 4 subjects, with Verwey, an acknowledged "short runner" or someone for whom a repellant does not last very long, making up 7 of the 17 data points. (TT 315–324.)

d. Finally, the 1989 Everglades test, upon which S.C. Johnson has relied extensively in this case, was conducted under very unrealistic conditions bearing no relation to the conditions under which most consumers would use an insect repellent. A biting density of 300—2,000 per minute such as existed at the site of the Everglades test is an intolerable and extremely dangerous condition in which no human would remain and in which an animal might die. (Novak Report at 4; TT 328–330; TT 1144–1145.) Accordingly, I do not rely on the Everglades test as a measure of SSS' efficacy for the average consumer.

**Avon's Field Test of SSS against Mosquitoes**

106. Avon relies on a 1995 field test in Everglades, Florida conducted by an independent agency, Insect Control & Research ("ICR") of Baltimore, Maryland, but sponsored by Avon. (TT 1003.) In this test, SSS had a mean time to confirmed bite of 1 hour, 57 minutes in a density of approximately 30 landings per minute. (TX 349.)

107. The 1995 ICR test is more reliable than any of the S.C. Johnson tests. Unlike any of the S.C. Johnson tests, it was conducted according to GLP. (Bertsch Decl. ¶ 1; TX 349 at 3 of 98; TT 1003.) It also utilized ten people, eight treated with SSS and two untreated controls (Novak Decl. at 5; TX 349 at 18 of 98), a greater number of individuals than used by S.C. Johnson in any one of its tests.

a. The ICR test was conducted in relatively rigorous conditions of 29 to 31 landings per minute. (TX 349 at 7 of 98; Novak Decl. at 5; Bertsch Decl. ¶¶ 20–22; TT 1021–1023.)

b. A density of fifteen lands per minute is the highest density that most people encounter before leaving an area (TT 1140–1142, 1148–1149) and a density of 30 mosquito lands per minute would cause considerable irritation to the average person (Novak Decl. at 5).

c. According to Avon's entomologist who was present during the test, Marvin Bertsch, there were mosquitoes available to bite throughout the test in the event that the product failed. (TT 1023–1024.)

108. Nevertheless, several methodological problems in the ICR test prevent me from crediting its conclusions as definitive.

a. First, the test was conducted only once, over one 2 1/2 hour period, with no replications. (TX 349 at 7 of 98; TT 1124.) The results of any scientific test should be repeatable at least three times in order to eliminate the possibility of results being skewed by conditions specific to the time that the test was first conducted. (Mulrennan Decl. ¶ 24.)

b. Second, ICR did not test SSS against the most aggressive species of mosquitoes. The test was conducted in December (TX 349 at 4 of 98), when the two most aggressive species of mosquitoes, *aedes taeniarhynchus* and *aedes sollicitans,* are generally at their lowest population levels (Mulrennan Rebuttal Decl. ¶ 30; Mulrennan Decl. ¶ 27; TT 1101–02). Of the 64 specimens collected in the test, 47 were of the *culex* species and 14 were of the *anopheles* species (TX 349 at 96 of 98), both less aggressive than the *aedes taeniarhynchus* species (Mulrennan Decl. ¶ 28, Mulrennan Rebuttal Decl. ¶ 30; TT·506–515, 1112–1115). By contrast, records of the test indicate that only 3 *aedes taeniarhynchus* were collected. (TX 349 at 96 of 98.) [10]

c. Third, a biting density of 30 lands per minute, though sufficient to cause considerable irritation to the average person, is well below the density of 50 lands per minute generally relied upon by S.C. Johnson in its field tests (Hageman Decl. ¶ 10), and does not provide the rigorous testing conditions that a density of 50 lands per minute would have provided (TT 399).

109. Although the 1995 ICR test of SSS in the Everglades offers some evidence of SSS' efficacy as an insect repellent, the lack of repetition, the fact that the test was conducted in December when few *aedes taeniarhynchus* are present, and the relatively low biting density prevent me from crediting its conclusions as definitive proof of SSS' repellency power.

**Arm–in–Cage Tests Against Mosquitoes**

110. The results of six arm-in-cage tests of SSS yield widely divergent results. However, like the field tests discussed above, the arm-in-cage tests confirm that SSS has some efficacy as a mosquito repellent, though it is not as effective as DEET and the exact duration of its efficacy is unclear.

111. A December 1979 arm-in-cage test conducted by an independent chemical company, McLaughlin, Gormely, King Co. ("MGK") concluded that SSS had an average time to confirmed bite of 80 minutes in a cage with 100 mosquitoes. (TX 322 at 0000946; TT 488.) Under the same conditions, a product that contained 20% DEET had an average time to confirmed bite of 340 minutes. (TX 322 at 0000946.)

112. A 1989 arm-in-cage test conducted by Carl E. Schreck and T.P. McGovern on behalf of the United States Department of Agriculture ("U.S.D.A.") concluded that SSS had a mean time to confirmed bite of approximately 38 minutes in a cage with 500 *aedes albopictus* mosquitoes. (TX 335; TT 495–496, 532–533, 1153–1155.) Under the same conditions, DEET products provided between six and eight hours of protection. (TX 335 at 249.)

113. A November 1990 arm-in-cage test conducted by S.C. Johnson concluded that

---

**10.** The collection of mosquitoes also included at least one male mosquito (TX 349 at 96 of 98), and male mosquitoes do not bite (TT 1018). ICR only collected mosquitoes approximately 90 minutes before the test, not during the test. (TT 1017, 1105–1108.) Thus, there might be some deviation between the species collected and the species actually present during the test.

SSS had a mean time to confirmed bite of 1 hour. (TX 340 at SCJ 013729.)

114. Three arm-in-cage tests conducted by Insect Control & Research also yielded widely divergent results.

a. An April 1987 arm-in-cage test conducted by ICR concluded that SSS had a mean time to confirmed bite of 1.1 hours, in a cage with 1,000—2,000 *aedes aegypti* mosquitoes (TX 328 at 100008; TX 331 at 120955.)

b. However, a June 1987 arm-in-cage test conducted by ICR under the same conditions concluded that SSS had a mean time to confirmed bite of 5 hours. (TX 331 at 120956–120957.)

c. Finally, in a January, 1988 arm-in-cage test SSS had a mean time to confirmed bite of 2.8 hours in a cage with 500–1000 *aedes aegypti* mosquitoes. (TX 334 at 100048.) DEET products were not tested in any of these tests.

115. Thus, I conclude that SSS clearly has some efficacy as a mosquito repellent, though the exact duration of its repellent efficacy is difficult to determine, and it is clearly not as effective as traditional DEET–based repellents.

116. I do not credit the theory of S.C. Johnson's expert entomologist, Dr. Mulrennan, that SSS works only as a mechanical barrier by causing mosquitoes to bounce off protected skin. (TT 437–441; Mulrennan Rebuttal Decl. at ¶ 3.) The independent Letterman Army study contradicts this theory and the court saw a videotape played at trial showing mosquitoes shying away from, rather than bouncing off, an arm protected by SSS. (TX 618.)

### C. S.C. Johnson's "Blind Label" Consumer Studies

117. Numerous "blind label" studies conducted by S.C. Johnson also indicate that SSS has some efficacy as an insect repellent and that consumers perceive SSS to be effective even when they do not know that the product they are using is SSS.

118. In "blind label" studies, a consumer is given a test product with a set of usage instructions and told to use the test product as they would any other product in that particular category. For example, in the 1989 blind label tests comparing SSS bath oil to other test substances, the products bore labels stating, "product that repels biting insects." (Palmersheim Rebuttal Decl. ¶ 4.)

119. Blind label tests do not provide an entomological measure of a substance's repellency power. However, they do measure consumers' perception of a product's efficacy absent any effects of branding. (TT 89–90.)

a. The blind label tests reported the following. In a 1988 blind label test comparing the "performance and acceptance" of SSS to the Skintastic prototype (*see* Stipulated Facts 9–10 *supra*) among 160 respondents in Tampa and New Orleans over a four week period, consumers perceived SSS to have "acceptable repellency characteristics," although respondents rated Skintastic's efficacy higher (TX 368 at 019799, 019803; TT 99–104).

b. In another 1989 blind label test, consumers perceived "equal repellency effects" among (1) a Skintastic prototype formula with 7.5% DEET, (2) SSS and (3) regular aerosol OFF! with 15% DEET. The test was conducted among 480 test subjects in "areas where a high probability of mosquito populations existed" in Tampa, Minneapolis and Portland over a four week period in August and September. (TX 370 at 007231–007236; TT 111–118.)

c. In a 1992 blind label test, respondents perceived virtually no differences in repellency characteristics between SSS and three OFF! products. (TX 376 at 001779.) The test was conducted among 2700 repellent users "in multiple strong repellent markets in the North and South." (TX 376 at 001763.)

d. Finally, in a 1994 blind label test comparing SSS to two S.C. Johnson Skintastic products among 640 consumers in unidentified "Southern markets" (TX 379 at 0001687), "neither of the Skintastic products achieved significantly higher efficacy scores than Skin–So–Soft." As a result of this test, S.C. Johnson determined that a "clear *efficacy* superiority claim [for OFF! versus SSS] cannot ... be substantiated." (TX 379 at

001684; TT 270–271, 184–190) (emphasis in original).

## D. The Efficacy of SSS Against Other Insects

120. As S.C. Johnson correctly points out, mosquitoes are generally the primary insect against which repellents are used. (TT 1447.) However, substantial consumer survey data also indicate that repelling insects other than mosquitoes is very important to repellent purchasers.

a. For example, a 1988 S.C. Johnson "Blind Label" survey of OFF! and SSS users found that "repellency of biting flies is more important than the repellency of mosquitoes within the Avon user group." (TX 368 at 019799.)

b. Moreover, A & U's conducted by S.C. Johnson in 1992, 1993, and 1995 also demonstrated that those who use bath oil as a repellent also use it in substantial numbers against a wide variety of insects.

(i) Specifically, the 1992 A & U found that of those who purchase bath oil for use as a repellent, 28% use it against mosquitoes and 28% use it against midges, while 19% use it against gnats and 17% use it against biting flies. (TX 200 at 3284.)

(ii) Similarly, the 1995 A & U found that of those who purchase bath oil for use as a repellent, 38% use it against mosquitoes, while 35% use it against midges and 33% use it against chiggers. (TX 203 at 30933.)

(iii) The 1993 A & U also concluded that although "mosquitoes are by far the most prevalent and bothersome problem in all regions of the country," repellents "are used against a broad variety of insects." (TX 599 at 004584.)

(iv) A 1987 consumer survey conducted by Avon also found that SSS' "primary target is mosquitoes" but noted that SSS is also used "frequently" against fleas, midges, and gnats. (TX 107 at 0001038.)

c. The same survey data also show that even purchasers of traditional repellents use these products in substantial numbers against insects other than mosquitoes.

(i) For example, the 1995 A & U found that although the primary use of such prod-

ucts was against mosquitoes (59%), 52% of purchasers used the products against ticks and 50% used them against chiggers. (TX 203 at 30933.)

(ii) Similarly, the 1992 A & U found that 51% of purchasers used personal repellents against chiggers, 42% against midges and 39% against biting flies, although the primary use of such products was against mosquitoes (52%). (TX 200 at 003284.)

121. Accordingly, I find that although consumers use repellents primarily against mosquitoes, a substantial number of consumers also use repellents against other types of insects.

122. S.C. Johnson has not offered any evidence that SSS is not an effective repellent of midges, sand gnats and biting flies (TT 1187), and relevant test data indicate that SSS is effective at repelling these insects.

a. For example, a 1979 field test conducted by C.E. Schreck and D.L. Kline on behalf of the United States Department of Agriculture and published in Mosquito News in 1981 concluded that SSS and other "home remedies" including Johnson's Baby Oil are "very effective" against six different species of biting midges. However, the same study also concluded that these substances are effective "not because they repel midges, but because their oiliness traps midges on the skin surface." (TX 325 at 0001797.)

b. An April 1990 S.C. Johnson field test of SSS against sand gnats concluded that SSS had a median protection time against bites of over 2.5 hours. Under the same conditions, a 7.5% DEET lotion also had a median protection time of 2.5 hours, while a 7% DEET aerosol product had a median protection time of only 2.1 hours. (TX 341.)

c. In an April 1987 arm-in-cage test conducted by ICR, SSS had a mean time to confirmed bite of 2.2 hours in a cage with 100 stable flies. (TX 328 at 100009.) No DEET product was tested in this test.

d. In a June 1987 arm-in-cage test conducted by ICR, SSS had a mean time to confirmed bite of 3.5 hours in a cage with 100

stable flies. (TX 331 at 120956.) No DEET product was tested in this test.

e. Finally, in a January 1988 arm-in-cage test conducted by ICR, SSS had a mean time to confirmed bite of 4.8 hours in a cage with 50 stable flies. (TX 334 at 100048.) No DEET product was tested in this test.

123. Based upon this data, uncontradicted by S.C. Johnson, I find that SSS is an effective repellent of biting flies, midges and sand gnats.

124. In conclusion, field tests, arm-in-cage tests and blind label consumer tests all indicate that SSS has some efficacy as an insect repellent, though it is clearly not as potent as DEET and the exact duration of its efficacy as a mosquito repellent, as opposed to a fly, gnat, or midge repellent, has not been definitively proven in this case.

## XX. *HEALTH RISKS OF SSS AND DEET*

125. Despite the efforts of each party to portray the other's product as a major health risk, I find that neither SSS, when used as a repellent, nor DEET presents a serious public health concern at this time.

### A. SSS

126. S.C. Johnson contends that the use of SSS as an insect repellent poses a serious health concern because SSS' relative weakness at repelling mosquitoes exposes SSS users to a significant risk of mosquito-borne diseases. I disagree.

127. Mosquitoes transmit various diseases including malaria, yellow fever, dengue fever and encephalitis. (Mulrennan Decl. ¶ 5; TX 172 *passim.*)

128. Although over 800 cases of encephalitis were reported in the United States during the period 1990–1995 (Mulrennan Rebuttal Decl. ¶ 34), mosquito borne disease is not a significant health problem in this country (Gratz Decl. *passim*). In fact, the risk of contracting a mosquito borne disease in this country is no greater than the risk of being struck by lightning (Gerberg Decl. at 5; TT 1176) and the incidence of mosquito-borne

diseases is so low that it is not even tracked by the Centers for Disease Control and Prevention ("CDC") (Gratz Decl. at 4).

129. Moreover, for the reasons discussed *supra* at ¶ 94, no repellant can provide complete assurance of safety from insect-borne disease or infection. An individual would have to be completely immersed in repellent in order to obtain complete protection from insect bites. (Novak Decl. at 7; TT 339–341.)

130. Individuals can provide themselves with the greatest degree of protection from disease carrying mosquitoes by avoiding the outside during dusk, when such insects are most prevalent. (TT 1115.)

131. Accordingly, I find that the use of SSS as an insect repellent does not expose users to a significantly greater risk of disease than they would otherwise experience.

### B. DEET

132. Consumers have consistently expressed concern over the side effects of DEET (TX 538; TT 283–284), and some scientific studies suggest that DEET may cause irritation to the eyes (TX 537:1) and mucous membranes (TX 537:5), and may cause a toxic reaction if ingested (TX 537:7).

133. Avon has submitted a report by Dr. Bettina M. Francis, professor of toxicology at the University of Illinois, which is based on a review of data collected under the auspices of the Chemical Specialty Manufacturers Association. Dr. Francis' report concludes that DEET may cause serious toxic adverse effects in some users, including severe allergic reactions, seizures and urinary tract bleeding. (Francis Decl. *passim.*)

134. However, there is at this point little hard scientific data establishing that DEET poses a *serious* public health problem.

a. A Scientific Advisory Panel convened by the E.P.A. concluded that "[b]ased on the available toxicological data, the Agency believes that the normal use of DEET does not present a health concern to the general U.S. population." (TX 282 at 200677; Osimitiz Supplemental Decl.) [11]

---

11. However, the panel is still investigating the health hazards posed by DEET (TT 1274–1275)

and may yet conclude that DEET does in fact pose a serious public health risk.

b. A study conducted by Thomas G. Osimitiz and Roger H. Grothaus of S.C. Johnson, published in the Journal of the American Mosquito Control Association in 1995, identified only 14 cases of DEET associated neurotoxicity since 1965. (TX 272.)

c. Most of the currently available information relating to the health risks of DEET is anecdotal. Such information includes an ABC Prime Time Live story featuring a woman whose 27-year-old husband allegedly died as a result of using a DEET based repellent (TX 623 and TX 624), customer complaints to S.C. Johnson about the negative side effects of DEET, (the majority of these seem to concern skin irritation) (TX 538), and numerous other articles in the press (TX 537).

d. Indeed, Dr. Francis' conclusions are highly tentative. She admits that the data she has reviewed only "suggest" but "do not prove" that DEET "may" cause serious toxicity in "some" users. (Francis Decl. at 4.)

135. Accordingly, I do not find that there is at present significant or substantial evidence that the widespread use of DEET based insect repellents raises a significant public health concern, although enough questions have been raised about DEET's potential adverse effects that continued examination of this subject is likely to be ongoing.

## XXI. *S.C. JOHNSON'S DELAY IN BRINGING SUIT*

136. Although S.C. Johnson claims that it notified the E.P.A. in 1989 "as soon as it became aware of the impact of Avon's misrepresentations" upon the marketplace (S.C. Johnson Trial Mem. at 27), there is substantial evidence that S.C. Johnson was on notice of the "SSS problem" prior to the early 1980's. Nevertheless, S.C. Johnson did not file suit until 1994, and sued Avon only because Avon had sued it first (TT 29-34).

137. For example, in response to an Avon interrogatory, S.C. Johnson has admitted that "some SCJ management personnel believed that Avon was actively and regularly promoting the SSS bath oil as a repellent at least as early as 1978." (TX 307.) This admission is supported by substantial testimonial evidence.

a. Arthur Hageman, currently Senior Section Manager in Worldwide Insect Control at S.C. Johnson, and a biochemical technician at S.C. Johnson since 1967, saw SSS being sold among repellents in Savannah, Georgia in the early 1970s and was asked by S.C. Johnson's President to test SSS as a repellent in the mid-1970s. (Hageman Decl. ¶¶ 20-22.) At that time, Hageman tested Skin-So-Soft Bath Oil for repellency against black flies and mosquitoes and found no repellency. (*see* Stipulated Fact 11 *supra.*)

b. Similarly, John Boomsma, formerly Research Services Manager for insecticides at S.C. Johnson, and an employee of S.C. Johnson since 1962 (Boomsma Decl. ¶ 1) was aware that consumers were using SSS bath oil as a repellent in the 1970s and believed at that time that Avon representatives were responsible for marketing it as an insect repellent (TT 125, 129-132).

c. Herbert Beighley, S.C. Johnson's product manager in charge of insect repellents from 1980 to 1983, believed as early as 1980 that Avon sales representatives were marketing SSS as an insect repellent and that SSS was not an effective insect repellent. However, he decided not to discuss the matter with his superiors at S.C. Johnson at that time. (Beighley Dep. at 10-11, 21-26, 29-30.)

d. Finally, when considered in conjunction with the admissions of S.C. Johnson's own personnel, the fact that the Department of Defense tested SSS for repellent efficacy in 1979 because of reports that it was being "widely used as a mosquito repellent" (TX 326) suggests that S.C. Johnson was well aware of, and should have been well aware of, the SSS "problem" prior to 1980.

138. There is no dispute that S.C. Johnson was on notice of the SSS problem by the mid 1980s.

a. By February 1984, at S.C. Johnson there were concerns "internally that [SSS] was being marketed and used as an insect repellent." (Harris Dep. at 37-38.)

b. By 1985, the use of SSS as an insect repellent would arise "in every focus group

that SCJ could do" (Palmersheim Dep. at 21) and by the mid–1980s, S.C. Johnson was persuaded that "Avon was behind a large, organized push to promote SSS bath oil as a repellent." (May Decl. ¶ 13.)

c. A 1987 survey caused S.C. Johnson "to conclude that Avon was a bigger competitive threat than [S.C. Johnson] had thought before." (Palmersheim Dep. at 195–198.)

139. As noted, although S.C. Johnson notified the E.P.A. in 1989 and 1990 that Avon was marketing SSS as an insect repellent (May Decl. ¶¶ 16–18), it did not file this suit until 1994.

140. I find that S.C. Johnson's delay in filing suit has prejudiced Avon to some extent.

a. Avon has been unable to obtain certain evidence, including a 1987 mailing to sales representatives instructing them not to market SSS as an insect repellent that likely would have been available had S.C. Johnson brought suit earlier. (TT 782, 784–785, 1353–1354.)

b. Moreover, because S.C. Johnson delayed in filing suit, it failed to indicate to Avon that it considered Avon's response to the E.P.A. inquiries, which consisted of sending letters to sales representatives warning them not to promote SSS as an insect repellent, see ¶¶ 69–74 supra, to be inadequate.

141. More importantly, however, I find that the ill which S.C. Johnson has sought to cure by this litigation is no longer a problem requiring the injunctive or other relief it now seeks.

142. In December 1993, Avon obtained a sublicense to sell an E.P.A.–registered insect repellent product developed by another company, Primavera Laboratories, Inc. In May 1994, Avon began to market that product under the name "Skin–So–Soft Moisturizing Suncare Plus Mosquito, Flea & Deertick Repellent SPF 15 PABA–Free Sunscreen Lotion" or the "Skin–So–Soft Three–In–One Product." (See Stipulated Fact 41 supra.)

143. When Avon launched the Skin–So–Soft Three–in–One product, it sent a letter to all representatives reiterating that SSS bath oil should not be sold as an insect repellent.

(TT 1046.) At the same time, members of Avon management visited a number of cities around the country, met with members of Avon's sales organization to discuss the launch of the Three–in–One product, and told them that with the introduction of this product Avon "was finally putting the issue of repellency to bed" (TT 872–873), as Avon now had an E.P.A. registered insect repellent (TT 1079–1080).

144. The introduction of the Three–in–One product has also resulted in a corresponding decrease in the sales of SSS bath oil for use as a repellent. With the introduction of the Three–in–One product in 1994, SSS bath oil sales declined by approximately 30%–40%, with sales of the Three–in–One product roughly equivalent to the number of lost SSS sales. For example, SSS bath oil sales in 1991, 1992 and 1993 were approximately 14 million units per year. However, in the year the Three–in–One product was introduced, 1994, SSS bath oil sales fell to 9,444,700 units. Sales of the Three–in–One product in the same year totalled 4,781,100 units. Thus, the total number of sales of the two products in 1994 was 14,225,800 units— approximately the same number of SSS bath oil sales per year before the introduction of the Three–in–One product. In 1995, SSS bath oil sales were 8,646,900 units, while Three–in–One sales totalled 4,816,200 units. The total number of sales of the two products in 1995 was 13,463,100 units—again approximately equal to the sales of SSS bath oil alone prior to the introduction of the Three–in–One product. (TX 212; TT 698, 873–875, 1420.)

145. Thus, the data strongly suggest that since 1994, many consumers who previously purchased SSS bath oil for use as an insect repellent have been purchasing the Three–in–One product instead.

146. The lack of evidence that lists of uses have been distributed after 1993 also indicates that Avon sales representatives ceased promoting SSS as an insect repellent upon the introduction of the Three–in–One product. (See ¶¶ 66, 73 supra; TT 917, 944, 952.)

147. In June 1997, Avon also introduced the E.P.A.–approved Skin–So–Soft Bug

Guard Insect Repellent, thus providing consumers with yet another E.P.A.–approved Avon insect repellent. (*See* TX 286, TX 283 at 200510.) While it is too soon to evaluate the market impact of the Bug Guard Insect Repellent, it is likely that this too will result in decreased sales of SSS as an insect repellent.

## XXII. *S.C. JOHNSON'S DAMAGES MODEL*

148. S.C. Johnson has presented a claim for monetary damages based on a report prepared by Julie L. Davis, Partner–In–Charge of the Central Region Intellectual Property Practice of the firm of Arthur Andersen LLP, Chicago, Illinois. (Davis Decl. ¶ 1; TX 230.)

149. Ms. Davis calculated S.C. Johnson's damages from 1984 as a result of Avon's alleged wrongdoing by (1) multiplying the volume of SSS sales for each year by the percentage of SSS sales for use as a repellent, (2) multiplying that number by S.C. Johnson's market share in insect repellency, (3) multiplying that number by S.C. Johnson's incremental profits, and (4) adding pre-judgment interest. (Davis Decl. ¶ 11; TT 689–691.)

150. In factoring in the percentage of SSS sales for use as a repellent, Ms. Davis relied on data contained in an April 1996 S.C. Johnson marketing study entitled "Avon Skin–So–Soft Bath Oil Purchase and Usage Incidence Study" ("the 1996 P & U") which subdivided SSS purchasers into four categories: (1) those who purchase SSS primarily to repel insects, (2) those who purchase SSS to repel insects and use as a bath oil equally, (3) those who purchase SSS to repel insects and to use for some other reason and (4) those who purchase SSS primarily for use as a bath oil. (TX 211 at 44797.)

151. According to the 1996 P & U, 39% of SSS purchasers purchased it primarily to repel insects, 38% purchased it to use equally as an insect repellent and a bath oil, and 18% purchased it primarily for use as a bath oil. (TX 211 at 44797.)

152. On the basis of these data, Ms. Davis calculated three alternative measures of S.C. Johnson's damages. (Davis Decl. ¶ 7.)

153. The first damage calculation, $76,-463,000 ($120,645,000 including prejudgment interest), assumes that S.C. Johnson would have captured 100% of purchases of Avon SSS Bath Oil "primarily to repel insects," "to repel insects and use as a bath oil equally," and "to repel insects and use for some other reason." (Davis Decl. ¶¶ 11, 16.)

154. The second damage calculation, $56,-858,000 ($89,731,000 including prejudgment interest), assumes that S.C. Johnson would have captured 100% of purchases of Avon SSS Bath Oil "primarily to repel insects," and 50% of Avon SSS Bath Oil purchases "to repel insects and use as a bath oil equally," and "to repel insects and use for some other reason." (Davis Decl. ¶¶ 11, 16.)

155. The third damage calculation, $38,-239,000 ($60,352,000 including prejudgment interest), assumes that S.C. Johnson would have captured 100% of all purchases of Avon SSS Bath Oil "primarily to repel insects." (Davis Decl. ¶¶ 11, 16.)

156. I do not credit the Davis study as a reliable or persuasive measure of S.C. Johnson's damages resulting from Avon's alleged wrongdoing for the following reasons.

a. First, because no data was available to her, Ms. Davis simply "estimated" SSS sales for the years 1984–1987 and S.C. Johnson's market share for the years 1984–1990. (Davis Decl. ¶¶ 12, 14; TT 691–692.) I find this premise to be highly speculative and unreliable.

b. Second, according to the raw data in the 1996 P & U, approximately 34 million households purchased approximately 110 million units of SSS bath oil in 1996.[12] (TX 648;

---

12. The 1996 P & U is based on self-administered questionnaires that were mailed in April 1996 to households that are members of Consumer Mail Panel ("CMP"), a controlled mail panel consisting of approximately 450,000 households in the United States. The P & U states that one out of every 237 households in the United States is a member of CMP. (TX 211 at 44798.) Thus, according to the P & U, the total number of households in the U.S. is 106,650,000 (450,000 × 237). The P & U also assumes that approximately one-third of U.S. households purchased SSS in the

TT 1282.) In fact, actual SSS bath oil sales in 1996 totalled only 8,385,680 units. (TX 230 Schedule G.) Because the 1996 P & U overstated SSS sales by 1300% (TX 648; TT 712–717), any damages model that relies upon the 1996 P & U is necessarily flawed.

c. Third, the Davis model assumes that every SSS sale is the result of Avon's wrongdoing (TT 696) including all word-of-mouth promotion of SSS as an insect repellent (TT 721) and all media references to SSS as an insect repellent (TT 721–722). However, as discussed *supra*, Avon is not the primary source of the repellency folklore and in fact, is responsible for at most 32% of those consumers who believe that SSS is an effective repellent. (*See* ¶¶ 76–82 *supra* ).

d. Fourth, the Davis model assumes that every SSS purchaser would have bought a DEET–based product had SSS not been marketed as a repellent. (TT 702–03, 705.) However, the raw data underlying S.C. Johnson's 1995 A & U indicates that only 25% of SSS users would be willing to buy an OFF! product if SSS were not available. (TT 1294–1297.)

e. Fifth, S.C. Johnson's own study of the "convertibility" of insect repellent purchasers concluded that SSS enjoyed the highest degree of brand loyalty of all major insect repellents, with 66% of users "secure" in keeping SSS as their main brand, and 27% of SSS users "entrenched" (i.e. "most resistant to switching main brands"). The same survey concluded that only 5% of SSS users are convertible to another repellent. (TX 209 at 006120.) Neither this study, nor the 1995 A & U Study directly addressed the issue of what SSS purchasers would do if SSS were not on the market or if it were labelled in the manner suggested by S.C. Johnson. However, the high degree of brand loyalty demonstrated by SSS users undermines Ms. Davis' assumption that all, or even a significant number, would necessarily switch to DEET–based products.

previous 12 months (TX 211 at 44797) thus suggesting that approximately 34,128,000 (.33 × 106,650,000) households had purchased SSS during the previous 12 month period (TX 648). According to S.C. Johnson's 1995 Insect Repellent Attitude & Usage Study, the mean number of

f. Finally, the Davis model wrongly assumes that SSS and OFF! unit sales are completely comparable. (TT 708–710, 738–739.) This assumption fails to take into account the differences between the products in liquid volume, size, packaging, efficacy, and amounts applied by the consumer. (Love Decl. at 15.) For example, the 1995 A & U established that 71% of those respondents who claimed to purchase the bath oil for use as a repellent did not use the whole bottle for that purpose. (TX 203 at 31102; TT 738–739.) By contrast, OFF! purchasers presumably use the whole bottle for repellency, as no alternative uses for OFF! have been identified.

157. In short, I find that Ms. Davis' model fails to present an accurate or reliable calculation of any damages S.C. Johnson may have suffered as a result of Avon's alleged wrongdoing in marketing SSS as an insect repellent.

## XXIII. *FACTUAL CONCLUSIONS*

158. In sum, I find the following:

(1) Consumers perceive SSS bath oil to be an effective repellent and use it as such.

(2) Although Avon's official policy is to prohibit the marketing of SSS as an insect repellent, Avon has sought to exploit the popularity of SSS as an insect repellent and some Avon sales representatives have marketed SSS as an insect repellent with the affirmative encouragement of Avon management.

(3) The primary source of the perception that SSS is an effective repellent is word-of-mouth among Avon consumers.

(4) SSS has some efficacy as an insect repellent, though it is not as effective as DEET–based repellents and it is not as effective as consumers believe it is.

SSS purchases by SSS purchasers in 1995 was 3.2. (TX 203 at 031100.) Thus, according to the 1996 P & U, the total number of SSS units sold in 1996 should have been approximately 109,-209,600 (34,128,000 × 3.2). (TX 648.)

(5) Neither the use of SSS nor DEET as an insect repellent poses a serious public health risk.

(6) The marketing and use of SSS bath oil as an insect repellent has declined significantly since the introduction of Avon's Three–in–One product in 1994.

### CONCLUSIONS OF LAW

159. This Court has original jurisdiction over this false advertising action pursuant to 28 U.S.C. § 1331 (1993). Venue is proper in this district pursuant to 28 U.S.C. § 1391 (1993).

160. I adopt herein any Finding of Fact previously set forth which might more properly be deemed a Conclusion of Law.

### XXIV. *ADVERTISING AND PROMOTION UNDER THE LANHAM ACT*

161. Section 43(a)(1)(B) of the Lanham Act provides in relevant part:

Any person who, on or in connection with any goods or services, . . ., uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any . . ., false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities or geographic origin of . . . another person's goods, services or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).

162. The first requirement of a Lanham Act violation is "commercial advertising or promotion" by a defendant.

163. As one court has stated, "[t]he words 'advertising' and 'promotion,' connote reaching out to consumers. In modern jargon, these words connote proactive, not merely reactive, communication. Lanham Act 'advertising or promotion' usually involves initiating notice to consumers. . . ." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,* 942 F.Supp. 209, 215 (S.D.N.Y.1996).

164. In order for representations to constitute "commercial advertising or promotion" under Section 43(a)(1)(B), the representations must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry. *Gordon & Breach Science Publishers v. A.I.P.,* 859 F.Supp. 1521, 1535–36 (S.D.N.Y.1994). The level of dissemination required to constitute advertising and promotion will vary from industry to industry and case to case. *Fashion Boutique,* 942 F.Supp. at 216.

165. Dissemination to a single customer is generally not sufficient. *Id.* However, where the relevant purchasing public is very small, misrepresentations, though few in number, which reach a significant portion of the purchasing public are actionable. *See Seven–Up Co. v. Coca–Cola Co.,* 86 F.3d 1379, 1386 (5th Cir.1996) (allegedly false representations made to eleven of seventy-four members of relevant purchasing public constitutes "advertising or promotion" under the Lanham Act); *National Artists Management Co. v. Weaving,* 769 F.Supp. 1224, 1235–36 (S.D.N.Y.1991) (defendant's conversations with ten of plaintiff's thirty clients constituted advertising or promotion under the Lanham Act where industry was "indisputably small and closely interconnected").

166. In this case, I conclude that Avon has engaged in advertising and promotion under the Lanham Act. I find this despite the fact that the members of the relevant purchasing public indisputably number in the millions, and S.C. Johnson has only presented approximately 100 lists identifying SSS as an insect repellent from Avon's files.

167. My conclusion that Avon has advertised and promoted SSS bath oil as an insect repellent is based on the factual findings described above and summarized as follows:

(1) The lists of alternative uses of SSS clearly had limited but significant distribution. They appeared in locations as disparate as Georgia, North Carolina, New York, Michigan, Wisconsin, Illinois, Alaska, Washington, Kentucky and Virginia during the period 1987 (and possibly as early as

the late 1970's) until 1993. One former District Sales Manager, Maria Penninger, saw a list of uses about ten times in 1983 alone and saw lists about 50 times during her eight year tenure as a Division Sales Manager in Tennessee and Mississippi. (¶¶ 60–65 *supra.*)

(2) The strong degree of similarity among the lists, the fact that the "Eighth Wonder" ad was reproduced on some of the lists, the fact that some Avon managers encouraged sales representatives to use the lists in promoting SSS and the fact that some members of Avon management sought to exploit the repellency folklore surrounding SSS suggests that Avon played a role in the creation or distribution of the lists. (*See* ¶¶ 59–66 *supra.*) At a minimum, Avon knowingly acquiesced in the circulation of these lists by its management and sales representatives.

(3) In addition to the lists, Avon management has produced other promotional materials advertising SSS as a repellent, including buttons, flyers, tee-shirts and business cards bearing the words "Avon" or "Skin–So–Soft" and depicting a dead insect inside a circle with a red line through it. (*See* TX 17; ¶ 60 *supra.*)

(4) At least 7%, and possibly as much as 32%, of the population that purchases SSS to use as an insect repellent has been influenced by an Avon related source to believe that SSS is an effective insect repellent. (¶ 77 *supra* ).

168. I conclude that this evidence of Avon's dissemination of information about SSS' repellency power, in the context of a business that relies exclusively upon promotion by its sales representatives, constitutes advertising and promotion under the Lanham Act.

## XXV. *FALSITY UNDER THE LANHAM ACT*

169. In order to recover damages or obtain equitable relief under the Lanham Act, a plaintiff must also show that either: (1) the challenged advertisement is literally false, or (2) while the advertisement is literally true it is nevertheless likely to mislead or confuse consumers. *Johnson & Johnson* *

*Merck v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir.1992).

170. In this case, S.C. Johnson contends that the claim that SSS is an effective repellent is literally false because it unjustifiably implies to consumers that SSS meets E.P.A. standards for efficacy and that Avon has test data supporting the repellency claim. (S.C. Johnson Trial Mem. at 19.)

171. However, the law does not impute representations of government approval or supporting test data in the absence of explicit claims.

a. In *Mylan Laboratories v. Matkari*, 7 F.3d 1130 (4th Cir.1993), the Fourth Circuit addressed the issue of whether generic drug manufacturers could be said to have falsely represented that their drugs had been approved by the FDA simply by marketing those drugs with standard package inserts often used for FDA-approved drugs. The Court held that absent an explicit representation that the drugs had received FDA approval, the defendant could not be held liable under the Lanham Act:

> [Plaintiff] nowhere points to any statement or representation in the defendants' advertising which declared 'proper FDA approval.' Moreover, that fatal deficiency cannot be cured by contentions that the very act of placing a drug on the market, with standard package inserts often used for FDA–approved drugs, somehow implies (falsely) that the drug had been 'properly approved by the FDA.' Such a theory is, quite simply, too great a stretch under the Lanham Act. We agree with defendants that permitting Mylan to proceed on the theory that the defendants violated § 43(a) merely by placing their drugs on the market would, in effect, permit Mylan to use the Lanham Act as a vehicle by which to enforce the Food, Drug, and Cosmetic Act ("FDCA") and the regulations promulgated thereunder. Id. at 1139.

b. Similarly, the Third Circuit has held in the context of a Lanham Act suit over a cough syrup that had not yet received FDA approval, "it is not sufficient for a Lanham Act plaintiff to show only that the defendant's advertising claims of its own drug's

effectiveness are inadequately substantiated under FDA guidelines; the plaintiff must also show that the claims are literally false or misleading to the public." *Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.,* 902 F.2d 222, 229 (3d Cir.1990). *See also Braintree Laboratories, Inc. v. Nephro–Tech, Inc.,* 1997 WL 94237 at ·* 6 (D.Kan.1997) ("because no private right of action exists under the Food, Drug and Cosmetic Act ("FDCA"), a plaintiff may not use the Lanham Act as an alternative vehicle by which to seek redress for an FDCA violation").

c. In other words, the standard of falsity under the Lanham Act is distinct from federal licensing standards and, absent an explicit claim that a product has been approved by the relevant federal agency or that the product meets federal standards, a Lanham Act plaintiff must prove that the defendant's efficacy claims are literally false, not simply that they fail to meet current federal licensing standards.

d. The cases cited by S.C. Johnson are not to the contrary. *Critical Vac. Filtration Corp. v. Northland Filter Systems International, Inc.,* 1991 WL 117699 No. 90–CV–1189 (N.D.N.Y.1991) only involved a factual issue about the veracity of defendant's claim that it used a testing method recommended by the E.P.A. Similarly, *Alto Products Corp. v. Tri Component Products Corp.,* 1994 WL 689418, at *2 (S.D.N.Y.1994) held only that the failure to designate a product as manufactured abroad in violation of the Tariff Act, 19 U.S.C. § 1304 (1993), may be misleading to the public and therefore a violation of the Lanham Act. Neither case supports ·the legal proposition that Avon's marketing of SSS as an insect repellent is an implied representation that SSS has received E.P.A. approval.

e. Nor is there legal support for S.C. Johnson's claim that "the representation that the product is an insect repellent falsely tells the public that Avon has test data which support the repellency claim." (S.C. Johnson Trial Mem. at 19.) Where an advertising claim "does not refer to tests, a plaintiff may prove the advertisement literally false only by producing evidence that affirmatively shows the claim to be false." *L & F Products v. Procter & Gamble Co.,* 845 F.Supp.

984, 1000 (S.D.N.Y.1994), *aff'd.,* 45 F.3d 709 (2d Cir.1995).

172. Moreover, even if S.C. Johnson were correct in arguing that SSS' efficacy as a repellent should be evaluated in terms of E.P.A. standards, the E.P.A. standard is simply too context-specific to provide a measure for evaluating liability under the Lanham Act.

a. S.C. Johnson points to the 2–3 hour standard originally set forth in the 1982 Product Performance Assessment Guidelines. (TX 174 at 15373; TX 358.) However, the 1982 Guidelines only stated that a product should "generally" provide a minimum of 2–3 hours protection time "depending upon the biting pressure evidenced in the testing." (TX 174 at 15373; 358.)

b. In May 1992, the E.P.A. approved registration of Primavera's TREO Product (*see* Stipulated Fact 41 *supra* ), which demonstrated effectiveness for one hour, on the condition that the product label state "Effectiveness lasts for up to one hour. Reapply when effectiveness diminishes" (TX 353 at 2; TT 427).

c. In 1997, the E.P.A. approved a one-hour efficacy standard for insect repellents having citronella oil as their active ingredient on the condition that "the user is provided instructions on how to maintain effective protection." (TX 639 at 6.)

173. Therefore, S.C. Johnson's Lanham Act claim must be evaluated in terms of literal falsity rather than E.P.A. standards. I find that Avon's representations that one alternative use for SSS is as an insect repellent are not literally false.

a. As discussed *supra,* the relevant entomological data indicates that SSS has some efficacy as an insect repellent. S.C. Johnson has not contradicted the proffered evidence that SSS is an effective repellent of midges, sand gnats and biting flies (TT 1187) and indeed the relevant test data, including tests conducted by the U.S.D.A. and S.C. Johnson, indicate that SSS does work to repel these insects (*see* ¶¶ 120–124 *supra* ).

b. The test data also indicate that SSS has some efficacy as a repellent of mosqui-

toes. In S.C. Johnson's 1989 field test in the Everglades, SSS had a mean time to confirmed bite of 24 minutes in extremely high densities of 300–2,000 landings per minute by the most aggressive mosquito species, *aedes taeniarhynchus.* (TX 193 at SCJ 013761; TT 334–336.)

c. In other tests, conducted in more reasonable conditions, SSS had a longer mean time to confirmed bite. In the Sanders Park test conducted by S.C. Johnson in 1989, SSS had a mean time to confirmed bite of 84 minutes in densities varying from 5 to 30 mosquito lands per minute. (TX 336 at 013787; TT 398–400.)

d. Similarly, in the 1995 ICR Everglades test sponsored by Avon, SSS had a mean time to confirmed bite of approximately two hours in densities of approximately 30 lands per minute. (TX 349.)

174. It is true, as S.C. Johnson claims, that SSS is not as effective an insect repellent as DEET. However, Avon has never made a comparative claim regarding SSS and DEET. Although "there need not be a direct comparison to a competitor for a statement to be actionable under the Lanham Act," *Castrol Inc. v. Pennzoil Co.,* 987 F.2d 939, 946 (3d Cir.1993), there is nothing in any of Avon's promotional materials that could be interpreted as even an implied representation that SSS is a more effective insect repellent than DEET. Accordingly, the relative efficacy of DEET and SSS is not at issue and the fact that DEET is a more effective repellent than SSS does not salvage S.C. Johnson's Lanham Act claim.

■ 175. Finally, S.C. Johnson's Lanham Act claim is also based on the contention that Avon is liable for failing to disclose to consumers that SSS is not an insect repellent. (S.C. Johnson Trial Mem. at 20–22.) This argument is also unavailing.

176. First, for the reasons discussed *supra,* SSS is an effective insect repellent and Avon cannot be held liable for failing to state publicly that it is not an insect repellent.

177. Second, the Lanham Act "impos[es] no affirmative duty of disclosure." *International Paint Co. v. Grow Group, Inc.,* 648 F.Supp. 729 (S.D.N.Y.1986); *see also McNeilab, Inc. v. American Home Products Corp.,* 501 F.Supp. 517, 532 (S.D.N.Y.1980) ("a failure to inform consumers of something, even something that they should know, is not *per se* a misrepresentation actionable under Section 43(a) of the Lanham Act.").[13]

178. Accordingly, Avon cannot be held liable under the Lanham Act for failing to state publicly that SSS is not an effective insect repellent.

## XXVI. *LACHES*

■ 179. Avon has advanced several other arguments for dismissal of S.C. Johnson's Lanham Act counterclaim, including (1) S.C. Johnson's suit is barred by the doctrine of laches (Avon Trial Mem. at 61–70); (2) S.C. Johnson's suit is barred by the doctrine of unclean hands (Avon Trial Mem. at 118–121); (3) S.C. Johnson lacks standing to bring its counterclaim (Avon Trial Mem. at 70–78); and (4) Avon cannot be held liable for the actions of its independent contractor sales representatives (Avon Trial Mem. at 112–117).

180. With regard to Avon's laches argument, I find that S.C. Johnson's delay in bringing this suit until Avon filed suit renders injunctive relief and monetary damages unwarranted as a matter of equity.

■ 181. In a suit under the Lanham Act, a presumption of laches applies after the expiration of the analogous state statute, the New York six-year statute of limitations on fraud actions. *Conopco, Inc. v. Campbell Soup Co.,* 95 F.3d 187, 191 (2d Cir.1996). S.C. Johnson delayed more than six years in bringing this suit and therefore bears the burden to "show why the laches defense ought not be applied...." *Id.* S.C. Johnson cannot meet this burden.

182. Although S.C. Johnson claims that it notified the E.P.A. in 1989 "as soon as it became aware of the impact of Avon's mis-

---

**13.** *Alto Products,* cited by S.C. Johnson, held only that the failure to designate a product as manufactured abroad in violation of the Tariff Act, 19 U.S.C. § 1304, may be actionable under the Lanham Act. It did not establish a general duty of disclosure under the Lanham Act.

representations" upon the marketplace (S.C. Johnson Trial Mem. at 27), there is no dispute that S.C. Johnson was on notice of a serious SSS "problem" by the mid–1980s, and there is substantial evidence that S.C. Johnson was on notice of the SSS "problem" prior to the early 1980's. *See* ¶¶ 136–139 *supra*. Nevertheless, S.C. Johnson did not file suit against Avon until 1994. S.C. Johnson's claim that it delayed in filing suit because it was waiting for the E.P.A. to take action is unpersuasive given the E.P.A.'s refusal to act in response to S.C. Johnson's vigorous demarches in 1990. (*See* TX 508, 509.)

183. "In order to prevail on the affirmative defense of laches, a defendant must prove that it has likely been prejudiced by the plaintiff's unreasonable delay in bringing the action." *Conopco*, 95 F.3d at 192. In this case, I find that Avon has been prejudiced by S.C. Johnson's delay in filing suit. Avon has been unable to obtain certain evidence, including a 1987 mailing to sales representatives instructing them not to market SSS as an insect repellent that might have been available had S.C. Johnson brought suit earlier. (TT 782, 784–785, 1353–1354.) Moreover, because S.C. Johnson delayed in filing suit, it failed to indicate to Avon that it considered Avon's response to the E.P.A. inquiries to be inadequate, *see* ¶¶ 69–74 *supra*, thereby giving Avon an earlier opportunity effectively to correct the situation of which S.C. Johnson now complains.

184. S.C. Johnson's argument that the public interest in preventing consumer deception militates against a finding of laches, (S.C. Johnson Trial Mem. at 27), is also unpersuasive.

185. As a result of S.C. Johnson's delay, the ill which it seeks to cure by this litigation has substantially waned. The introduction of Avon's Three–in–One product in 1994 resulted in a corresponding decrease in the sales of SSS bath oil for use as a repellent. The data suggest that since 1994, many consumers who previously purchased SSS bath oil for use as an insect repellent have been purchasing the Three–in–One product instead. *See* ¶¶ 141–145 *supra*. Moreover, a Dateline–NBC report broadcast in July 1997 also indicates that consumers are becoming increasingly aware of the fact that SSS is not as effective as traditional repellents and that the power of the repellency folklore is decreasing.

186. The lack of evidence that lists of uses have been distributed after 1993 also indicates that Avon sales representatives ceased promoting SSS as an insect repellent upon the introduction of the Three–in–One product. (*See* ¶¶ 66, 73 *supra*; TT 917, 944, 952.)

187. Finally, because SSS has some efficacy as an insect repellent, and because the public health risks associated with the use of SSS as a repellent are only minimal, *see* ¶¶ 125–135 *supra*, I find that the public interest does not militate against application of the doctrine of laches.

188. Accordingly, I find that S.C. Johnson's delay in bringing suit renders the award of the relief sought unwarranted as a matter of equity. *See, e.g. Burndy Corp. v. Teledyne Indus.*, 748 F.2d 767, 774 (2d Cir. 1984) (injunctive relief unwarranted in Lanham Act case in light of defendant's rectification of conditions that led to the suit and in absence of any likelihood of repetition or of any demonstrated hazard to the public)

## XXVII. *UNCLEAN HANDS*

189. Avon also argues that S.C. Johnson's claim is barred by unclean hands because S.C. Johnson acquiesced in the public's misperception that its "OFF! Skintastic for Children" product, which it sold to the public in 1994, contained a lower concentration of DEET than regular OFF!, when, in fact, both contained the same percentage of DEET, 7.5%. (Avon Trial Mem. at 118–121.)

190. However, there is no dispute that in 1995 S.C. Johnson ceased selling "OFF! Skintastic for Children" and instead introduced "Skintastic for Kids," a spray product with 5% DEET. (Avon Trial Mem. at 120 n. 4.)

191. Accordingly, I find that although S.C. Johnson's passive exploitation of the public's misperception regarding "OFF! Skintastic for Children" is troubling, it does not constitute "such an extensive course of

improper conduct that the plaintiff should be barred." *Burndy Corp. v. Teledyne Indus., Inc.*, 584 F.Supp. 656, 663 (D.Conn.), *aff'd.*, 748 F.2d 767 (2d Cir.1984).

## XXVIII. *STANDING*

192. Avon also argues that S.C. Johnson lacks standing because the OFF! line of products is "not in obvious competition" with SSS. (Avon Trial Mem. at 72.)

■ 193. Although SSS is designed as a bath oil, the Court was presented with evidence that Avon management considers insect repellency to be a brand equity of SSS (TX 137, 144, 145; TT 1062, 838–839), monitors registered insect repellents as competition for SSS (TX 68–72) and has sought to gain marketing benefits from the recall of chemical based repellents, such as S.C.Johnson's Deep Woods OFF! (TX 68–72). Accordingly, Avon cannot now claim that SSS has never been in competition with OFF! or that S.C. Johnson lacks standing to bring this suit.

194. Avon also argues that S.C. Johnson lacks standing because it has not suffered any actual injury as a result of Avon's alleged misrepresentations. This is simply a reiteration of Avon's arguments with regard to liability. In light of my factual findings with regard to the issue of liability, I need not reach Avon's contentions on this point.

## XXIX. *VICARIOUS LIABILITY*

195. Finally, Avon argues that it should not be held vicariously liable for the acts of its sales representatives who are independent contractors. To whatever extent Avon would otherwise not be responsible for the acts of independent contractors, I have found that some within Avon management directly encouraged and participated in circulating the lists of alternative uses of SSS and that Avon did not take sufficiently active steps until 1993 to stop its sales representatives from disseminating these lists. Therefore, I need not reach the issue of Avon's liability solely for the acts of its independent contractor sales representatives.

## XXX. *STATE LAW CLAIMS*

196. The standards for bringing a claim under § 43(a) of the Lanham Act are substantially the same as those applied to claims brought under the New York common law for unfair competition and §§ 349 and 350 of the New York General Business Law. *See, e.g. Ergotron, Inc. v. Hergo Ergonomic Support Sys., Inc.*, 1996 WL 143903 at *11, *13 (S.D.N.Y., March 29, 1996); *Weight Watchers Int'l, Inc. v. Stouffer Corp.*, 744 F.Supp. 1259, 1283 (S.D.N.Y.1990).

197. Accordingly, I deny S.C. Johnson's counterclaims under state law for the same reasons that I deny S.C. Johnson's counterclaim under the Lanham Act.

## XXXI. *AVON'S CLAIM FOR ATTORNEYS' FEES*

■ 198. Section 35(a) of the Lanham Act provides that the "court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(A) (1994).

199. I do not find this case to be "exceptional" within the meaning of 15 U.S.C. § 1117(A), nor do I find that S.C. Johnson, which has prevailed upon its claim that Avon promoted SSS as an insect repellent, has brought this case in bad faith. Accordingly, I conclude that Avon is not entitled to an award of attorneys' fees.

## XXXII. *CONCLUSION*

200. S.C. Johnson's counterclaim for injunctive and monetary relief is denied.

201. The Clerk of Court is directed to enter the following judgment:

(1) Upon stipulation of the parties, embodied in the Order dated February 7, 1997, Avon's complaint is dismissed;

(2) for the reasons set forth in Judge Schwartz' Opinion and Order of August 22, 1996, S.C. Johnson's first counterclaim is dismissed;

(3) for the reasons stated above, S.C. Johnson's second counterclaim is dismissed;

(4) Avon's request for an award of attorneys fees is denied.

**SO ORDERED.**